# EXHIBIT A

**TEAMSTERS LOCAL 677 HEALTH
SERVICES & INSURANCE PLAN, on
behalf of itself and all others similarly
situated,**

                    Plaintiff,

v.

**HOWARD E. FRIEDMAN**
1313 Doves Cove Road
Baltimore, Maryland 21286-1426

**DANIEL C. KEITH**
55 South Port Royal Drive
Hilton Head Island, South Carolina 29928-
5509

**MARTIN R. LEADER**
1318 Round Oak Court
McLean, Virginia 22101-1829

**LAWRENCE E. MCCANNA**
6155 Shadywood Road, Unit 205
Elkridge, Maryland 21075-6063

**CHRISTOPHER S. RIPLEY**
7343 Brightside Road
Baltimore, Maryland 21212-1012

**DAVID D. SMITH**
1511 Ivy Hill Road
Cockeysville, Maryland 21030-1417

**FREDERICK G. SMITH**
7 Timberpark Court
Lutherville Timonium, Maryland 21093-1111

**J. DUNCAN SMITH**
1226 Rock Lodge Road
McHenry, Maryland 21541-1241

**and ROBERT E. SMITH**
3600 Butler Road
Reisterstown, Maryland 21136-4813

IN THE

CIRCUIT COURT

OF MARYLAND

FOR

BALTIMORE COUNTY

CASE NO. _03-C-18-12119_

**SHAREHOLDER DERIVATIVE
COMPLAINT**



EMH

1000

**Defendants,**

**and,**

**SINCLAIR BROADCAST GROUP, INC.**
10706 Beaver Dam Road
Hunt Valley, Maryland 21030

Serve on:
The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093-2264

**Nominal Defendant.**

## COMPLAINT

Plaintiff Teamsters Local 677 Health Services and Insurance Plan ("Teamsters Local 677" or "Plaintiff"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Sinclair Broadcast Group, Inc. ("Sinclair" or the "Company"), files this Stockholder Derivative Complaint against Howard E. Friedman, Daniel C. Keith, Martin R. Leader, Lawrence E. McCanna, Christopher S. Ripley, David D. Smith, Frederick G. Smith, J. Duncan Smith and Robert E. Smith (the "Individual Defendants" and, collectively with Sinclair, referred to herein as the "Defendants") for breaches of their fiduciary duties to the Company. Plaintiff makes the following allegations based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by its attorneys. This investigation included, among other things, a review of the Company's announcements and press releases; filings made by the Company with the United States Securities and Exchange Commission ("SEC"); filings, communications and disclosures made with and by the United States Federal Communications Commission ("FCC"); corporate governance documents available on the Company's website; governmental and regulatory

2

investigations of the Company and documents relating thereto; and news reports and other publicly available information about the Company.

## I.    PRELIMINARY STATEMENT

1.    This shareholder derivative action arises from Defendants' breach of fiduciary duties owed to its shareholders in connection with the Sinclair Board of Directors' improper conduct engaged in during an attempted merger with Tribune Media Co. ("Tribune").

2.    Sinclair, headquartered in Hunt Valley, Maryland, is one of the largest and most diversified television broadcasting companies in the United States.  The Company owns more than 193 stations across the country in 100 markets, covering nearly 40% of American households.

3.    The Company is controlled by four brothers: David D. Smith, Sinclair's Executive Chairman since January 2017, President and Chief Executive Officer ("CEO") from 1988 until January 2017, and Chairman of the Board since September 1990; Frederick G. Smith, Sinclair's Vice President and director; J. Duncan Smith, Sinclair's Vice President, Secretary and director since 1986; and Robert E. Smith, a director of Sinclair since 1986 (collectively, the "Smith Brothers").  Together, the Smith Brothers own a 75% interest in Sinclair, including all of the Company's Class B common stock.

4.    On May 8, 2017, Sinclair announced a proposed $3.9 billion merger with Tribune (the "Tribune Merger"), which the Company referred to as its "largest acquisition" in the Company's history.  There was just one problem.  The Defendants failed to take the appropriate and necessary actions to avoid or eliminate any impediment to obtaining regulatory approval for the Tribune Merger.

5.      Pursuant to Federal Communications Commission ("FCC") rules, in order to enter and obtain regulatory approval for the proposed merger, the Company was required to ensure that, following the Tribune Merger, (1) it would not have an attributable interest in television stations reaching greater than 39% of the national audience, and (2) it would not own more than two stations in the same Designated Market Area. Prior to the Tribune Merger, accounting for an FCC discount applied to UHF stations, Sinclair stations purportedly reached approximately 25% of U.S. households.

6.      Rather than selling or divesting of the necessary assets "in order to comply with FCC ownership requirements and antitrust regulations," as the Company was required to do in order to obtain regulatory approval for the Tribune Merger, Defendants engaged in a scheme to deceive the FCC and shareholders by creating "sham" transactions with buyers intertwined with the Company and its controlling shareholders, the Smith Brothers, in an effort to convince regulators that Sinclair's proposed merger was in compliance with FCC ownership regulations.

7.      On July 16, 2018, FCC Chairman Ajit Pai reported that the FCC was internally circulating a draft order designating the Tribune Merger proposal for a hearing in front of the FCC's administrative law judge – a designation widely considered to be a death sentence for proposed mergers. Chairman Pai stated that there were "serious concerns" that "Sinclair's actions here potentially involve deception," and that "the evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

8.      The Company went to great lengths to avoid the FCC hearing. Yet, despite the Company's last-ditch effort to avoid a hearing by voiding the fraudulent sales, the FCC unanimously voted to send the proposed merger to a hearing.

9.     The FCC publicly released the final Hearing Designation Order ("HDO") on July 19, 2018 which stated that the Commission believes there to be "a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts" regarding whether Sinclair had "attempted to skirt the Commission's broadcast ownership rules."

10.    On August 9, 2018, in an emailed statement, Tribune announced its withdrawal from the $3.9 billion merger and stated that it had filed a lawsuit in the Delaware Chancery Court against Sinclair seeking $1 billion in damages for losses incurred as a result of Sinclair's "material breaches" of the merger agreement.

11.    As a result of Defendants' breaches of fiduciary duty through their wrongful acts and omissions, shareholders have been irreparably harmed.  Not only has the Company's stock price plummeted over 20% since announcement of the Tribune Merger, but the Company is facing a billion-dollar lawsuit, an antitrust judgment against it by the U.S. Department of Justice following an investigation triggered by the failed Tribune Merger, and securities fraud allegations.  This has caused the Company to expend, and continue to expend, significant sums of money, at shareholder expense as a result of the wrongful conduct of the highly interested Board of Directors.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the claims asserted herein as they involve violations of Maryland law and the amount in controversy exceeds $5,000.

13.    This Court has jurisdiction over each Defendant named herein pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103 because each Defendant is either a corporation or an individual that transacts business or performs any character of work or service in the State.

5

14.     Venue properly lies in the County of Baltimore pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201(a) because each Defendant named herein either resides in, carries on a regular business in, is employed in, or habitually engages in a vocation in this County, and Defendant Sinclair is a corporation which may be sued where it maintains its principal offices in the State, which it does in this County.  Moreover, to the extent any Defendant denies that this County is a proper venue as to them, all Defendants may be sued in any County in this State in which any one of them could be sued, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201(b).

## III.    PARTIES AND INTERESTED NON-PARTIES

### A.      **Plaintiff**

15.     Plaintiff Teamsters Local 677 Health Services & Insurance Plan is headquartered in Connecticut.  Plaintiff currently is and continuously has been a stockholder of Sinclair throughout the period of the acts complained of herein.

### B.      **Nominal Defendant**

16.     Nominal Defendant Sinclair Broadcast Group, Inc. is a Maryland corporation with its headquarters located at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030.  Sinclair's common stock is traded on the NASDAQ under the symbol "SBGI."  Sinclair is one of the largest and most diversified television broadcasting companies in the United States.  The Company owns more than 193 stations across the country in 100 markets, covering 40% of American households.  The Company's business is governed by the rules and regulations of the FCC.

### C.      **Defendants**

#### 1.      **The Smith Brothers**

17.     Defendant David D. Smith ("David Smith") has served as Executive Chairman since January 2017 and Chairman of the Board since September 1990. Until January 2017, he served as President and Chief Executive Officer since 1988. Defendant David Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of Frederick, J. Duncan, and Robert Smith. In 2017, Defendant David Smith's total compensation from Sinclair was $6,638,369.

18.     Defendant Frederick G. Smith ("Frederick Smith") has served as Vice President of Sinclair since 1990 and as a director since 1986. Defendant David Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, J. Duncan, and Robert Smith. Sinclair's Form DEF 14A, filed April 26, 2018 for the fiscal year ending December 31, 2017 (the "2017 Proxy Statement") does not provide compensation information for Defendant Frederick Smith.

19.     Defendant J. Duncan Smith has served as Vice President, Secretary and director of Sinclair since 1986. Defendant David Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Frederick, and Robert Smith. Sinclair's 2017 Proxy Statement does not provide compensation information for Defendant J. Duncan Smith.

20.     Defendant Robert E. Smith ("Robert Smith") has served as a director of Sinclair since 1986. Defendant David Smith is the son of Julian Sinclair Smith and Carolyn Cunningham Smith, and the brother of David, Frederick, and J. Duncan Smith. In 2017, Defendant Robert Smith's total compensation from Sinclair was $182,540.

      **2.      Other Directors and Officers**

21.     Defendant Howard E. Friedman ("Friedman") has served as a director of Sinclair since January 2015, and sits on the Company's Compensation Committee. In 2017, Defendant Friedman's total compensation from Sinclair was $196,040.

22.     Defendant Daniel C. Keith ("Keith") has served as a director of Sinclair since May 2001, and sits on the Company's Audit Committee and Compensation Committee. In 2017, Defendant Keith's total compensation from Sinclair was $216,540.

23.     Defendant Martin R. Leader ("Leader") has served as a director of Sinclair since May 2002, and sits on the Company's Audit Committee and Compensation Committee. In 2017, Defendant Leader's total compensation from Sinclair was $210,540.

24.     Defendant Lawrence E. McCanna ("McCanna") has served as a director of Sinclair since July 1995, and sits on the Company's Audit Committee and Compensation Committee. In 2017, Defendant McCanna's total compensation from Sinclair was $216,040.

25.     Christopher S. Ripley ("Ripley") has served as the CEO and President of Sinclair since January 2017. In 2017, Ripley's total compensation from Sinclair was $1,836,332.

26.     Together with the Smith Brothers, Defendants Friedman, Keith, Leader, McCanna and Ripley are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Sinclair's reports to the SEC and public filings with the FCC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant, while serving as a director of Sinclair, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions

8

and access to material nonpublic information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the representations which were being made were then materially false and/or misleading. Further, the Individual Defendants, based on their positions within the Company, knew or should have known that the Company was not in fact, as it claimed, using its "best efforts" to obtain regulatory approval for the Tribune Merger, and that the purported "divestitures" proposed to the FCC were in fact insider deals which would have allowed Sinclair to continue to exert its control over the "divested" stations in contravention of FCC ownership rules. Accordingly, the Individual Defendants are liable for breaching their fiduciary duty, as plead herein.

D.      **Relevant Non-Parties**

27.     Lucy A. Rutishauser ("Rutishauser") has served as the Senior Vice President and Chief Financial Officer of Sinclair since January 2017. Prior to that, she served as Senior Vice President of Corporate Finance and Treasurer from December 2013 to January 2017. In 2017, Rutishauser's total compensation from Sinclair was $1,153,473.

28.     Atlantic Automotive Corporation ("Atlantic") is a holding company of MileOne Autogroup, a network of 40 auto dealerships in Maryland, North Carolina, Pennsylvania and Virginia. Since at least 1997, Steven Fader ("Fader") has acted as CEO of Atlantic. Sinclair was previously a 17.5% owner of Atlantic, before selling its stake in February 2006. Both David Smith and Leader, current directors of Sinclair, served as directors of Atlantic while Sinclair had an ownership stake in the company. Fader and David Smith remain close business partners – David Smith retained a controlling interest in Atlantic after Sinclair sold its stake, and he continues to serve as a board member of Atlantic. Further, Atlantic is a Sinclair advertiser and

9

tenant. Given these connections, Sinclair admits in its public filings that Atlantic is a "related person."

29.     Cunningham Broadcasting Corporation ("Cunningham") was formed in 1994 as Glencaire, Ltd. ("Glencaire"), and was headed by Edwin Edwards, a former Sinclair executive. Cunningham is a television company that, together with its subsidiaries, owns and/or operates 20 television stations in 18 markets across the United States. The initial capital investment to establish Cunningham was provided by Carolyn Cunningham Smith, wife of Sinclair founder Julian Sinclair Smith and mother of the Smith Brothers. In 2001, the company changed its name to Cunningham Broadcasting Corporation, naming itself after Carolyn Cunningham Smith. The Smith family has held a controlling interest in Cunningham since its formation. In January 2018, the estate of Carolyn Smith sold the voting stock in Cunningham to Michael Anderson, a longtime banker for David Smith, for a below-market price of $400,000. However, the Smith Brothers retain an option to repurchase their interest in Cunningham. Cunningham has a history of buying divestitures from Sinclair accompanied by "sidecar arrangements" (further defined below) that allow Sinclair to continue exercising control over the divested TV stations. Further, to fund the purchase of divestitures, Sinclair has provided Cunningham with access to substantial liquidity in the form of debt – as of 2018, Cunningham owed Sinclair approximately $53 million. Given the close connections between and among Sinclair, the Smith family, and Cunningham, the Company likewise admits in its public filings that Cunningham is a "related person."

## IV.    LEGAL DUTIES

### A.    Duties of the Individual Defendants

30.     By reason of their positions as officers, directors, and/or fiduciaries of Sinclair and because of their ability to control the business and corporate affairs of Sinclair, the

Individual Defendants owed and continue to owe Sinclair and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sinclair in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sinclair and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

31.     To discharge their duties, the officers and directors of Sinclair were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Sinclair were required to, among other things:

    a.  ensure the Company complied with its legal obligations and requirements, including complying with regulatory requirements by devising and implementing a system of internal controls sufficient to ensure the Company employed appropriate accounting practices;

    b.  monitor and oversee the system of internal controls sufficient to ensure that the Company's accounting practices were appropriate;

    c.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    d.  remain informed as to how Sinclair conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws; and

    e.  ensure the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sinclair, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sinclair and was at all times acting within the course and scope of such agency.

B.     **Duties of the Board of Directors and Audit Committee**

34.     According to the 2017 Proxy Statement, the Board of Directors of Sinclair ("the Board"), as a whole, is responsible for overseeing the Company's risk exposure, both independently and with the assistance of the Audit Committee and Compensation Committee. *See* 2017 Proxy Statement, attached hereto as "**Exhibit A**," at 12. The Board held a total of nine meetings in 2017. *See id.*

35.     During the time of the events complained of herein, the Audit Committee included Defendants McCanna, Keith and Leader. *See id.* at 13. The Audit Committee held five meetings during the year ended December 31, 2017. *See id.*

36.     According to the Charter of the Audit Committee, posted on the Company's website,

> The primary functions of the Audit Committee (sometimes referred to herein as the "Committee") are to oversee the:
>
> (i)    *Systems of internal and disclosure controls regarding finance, accounting, legal issues, regulatory compliance and ethical behavior;*
>
> (ii)   Accounting and financial reporting and disclosure processes and the audits of [the Company's] financial statements;
>
> (iii)  Financial statements and other financial information provided to the public or reporting agency; and
>
> (iv)  Performance of the Company's Internal Audit Department and independent auditors. Consistent with these functions, the Committee will encourage

continuous improvement of, and foster adherence to, the Company's policies, procedures and practices at all levels.[1]

37.     The Charter of the Audit Committee also provides the scope of the responsibilities

of the Audit Committee, which includes, *inter alia*, the activities listed below:

    a.    Prepare the report required by the [SEC] to be included in the Company's annual proxy statement and any other Committee reports required by NASDAQ;

    b.    Review and discuss with Management, the Company's earnings/press releases (including the use of "pro-forma" or "adjusted" non-GAAP information) as well as financial information and earnings guidance provided to analysts and rating agencies;

    c.    Review and discuss with Management, all material, off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities or other persons, that may have a material current or future effect on financial condition, changes in financial condition, results of operations, liquidity, capital resources, or capital reserves;

    d.    Inquire about the application of the Company's accounting policies on a consistent basis from period to period, and the compatibility or these accounting policies with generally accepted accounting principles, and the Company's provisions for future occurrences which may have a material impact on the financial statements of the Company;

    e.    Review and discuss with Management (i) the Company's major financial risk exposures and the steps Management has taken to monitor and control such exposures (including Management's risk assessment and risk management policies), and (ii) the program that Management has established to monitor compliance with its code of business ethics and conduct for directors, officers and employees;

    f.    Review and discuss with Management all disclosures made by the Company concerning any material changes in the financial condition or operations of the Company;

    g.    Receive and review the reports of the Company's Chief Executive Officer and Chief Financial Officer required by Rule 13a-14 of the Exchange Act;

---

[1]     http://sbgi.net/wp-content/uploads/investor-relations/governance-ethic-docs/02-2015-audit-commitee-charter.pdf (last accessed November 8, 2018) (emphasis added).

h.    Review and approve all related-party transactions (defined as transactions required to be disclosed pursuant to Item 404 of Regulation S-K);

i.    Review and approve (i) any change or waiver in the Company's code of business conduct and ethics for directors or executive officers, and (ii) any disclosure made on Form 8-K or the Company's website regarding such waiver or change; and

j.    Report regularly to the Board.

38.    In addition, according to the 2017 Proxy Statement,

The Audit Committee assists the Board of Directors in its oversight of financial reporting practices and the quality and integrity of the financial reports of Sinclair *including compliance with legal and regulatory requirements*, the independent auditors' qualifications and independence and the performance of Sinclair's internal control function.    The Audit Committee is responsible for the appointment of Sinclair's independent auditors, whose appointment may be ratified by the shareholders.  The Audit Committee *oversees all of our internal controls* and risk management policies and meets with our independent auditor and management regarding our internal controls and other matters.  The Audit Committee is responsible for reviewing compliance with Sinclair's ethics policy and has established procedures for the receipt, retention and treatment of complaints received by Sinclair regarding accounting controls or auditing matters and the confidential, anonymous submission by Sinclair's employees of concerns regarding questionable accounting or auditing matters.  The Audit Committee is also *responsible for approving or ratifying related person transactions* pursuant to Sinclair's related person transaction policy.

Ex. A at 13 (emphasis added).

39.    With respect to the Audit Committee's responsibility for oversight of related person transactions, the 2017 Proxy Statement includes a "Related Person Transactions" section, which states, in part:

Our related person transaction policy covers *any transaction, arrangement or relationship, or any series of similar transactions, arrangements or relationships in which the Company was or is to be a participant, wherein the amount involved exceeds $120,000 and a related person had or will have a direct or indirect material interest*.  The Board of Directors has determined that certain transactions falling within the characteristics above do not create a material direct or indirect interest on behalf of the related person, and are, therefore, not deemed to be related person transactions.

*The Audit Committee of the Board of Directors reviews all material related person transactions and may approve or ratify the related person transaction only if the Audit Committee determines that, under all of the circumstances, the transaction is in, or is not inconsistent with, the best interests of the Company.* The Audit Committee may, in its sole discretion, impose such conditions as it deems appropriate on the Company or the related person in connection with approval of the related person transaction.

*Id.* at 32 (emphasis added).

C.  **Duties Arising from Sinclair's Code of Business Conduct and Ethics**

40.  Sinclair has also adopted a Code of Business Conduct and Ethics (the "Code"), which it maintains on its website.[2] According to the Code itself, the Code was adopted in order to:

a.  identify the ethical duties and responsibilities of officers, directors and employees;

b.  provide guidance and assist [officers, directors and employees] with ethical issues;

c.  provide mechanisms to report unethical conduct; and

d.  foster a culture of honesty and accountability.

41.  During the time of the events complained of herein, the Code, which applied to all of the Individual Defendants, provided in pertinent part:

It is the policy of the Corporation to prohibit its officers, directors and employees from engaging in any activity or practice in conflict with the interests of the Corporation. All officers, directors and employees must avoid conflicts between their personal interests and the interests of the Corporation in dealing with fellow employees, other organizations, clients, vendors, or individuals seeking to do business with the Corporation.

\*　　　\*　　　\*

---

[2]  *See*  http://sbgi.net/wp-content/uploads/investor-relations/governance-ethic-docs/SBGI-Code-of-Business-Conduct-and-Ethics-2015.pdf (last accessed November 8, 2018).

Officers, directors and employees must comply with all laws, rules and regulations applicable to them or the Corporation, including, without limitation, insider-trading laws, antitrust laws, intellectual property laws, anticorruption laws, lobby laws and FCC rules and regulations.

*    *    *

It is extremely important that the Corporation's accounting, financial and other systems provide accurate and timely reporting of transactions involving Corporation assets. The Corporation is committed to full, fair, accurate, timely and understandable disclosure in reports and documents filed with or submitted to the Securities and Exchange Commission and other regulators, and in other public communications made by the Corporation. Every accounting or financial record, as well as the underlying support data, must accurately describe the transaction without omission, concealment or falsification of information. If an employee becomes aware of any information that could reasonably be deemed to have a material effect on the Corporation, he/she must ensure that the information is passed up to the general manager of the station or, in the case of a corporate employee or a director, to the Corporation's Chief Financial Officer. Additionally, officers, directors and employees must comply with the Corporation's internal controls and procedures. If an employee observes or learns of a failure to comply with such controls and procedures, he/she must promptly notify the general manager of the station or, in the case of a corporate employee or a director, the Corporation's Chief Financial Officer.

*    *    *

The Corporation's assets, including but not limited to such information as customer lists, contractual agreements, pricing agreements, trade secrets, supplies, equipment, materials, intellectual property, software, hardware and facilities are valuable resources owned or licensed by or otherwise belonging to the Corporation and are to be used solely for the Corporation's purposes. Safeguarding this property from loss, damage or theft is the responsibility of all employees. No person shall take the Corporation's property or assets for personal use or gain, nor shall the Corporation's property or assets be given away, sold or traded without proper authorization.

*    *    *

The Corporation is committed to operating according to the highest standards of business conduct and ethics set forth in the Code. Each director, officer and employee is expected to report what he or she believes in good faith are actual or potential conflicts of interest, corporate opportunities, violations of applicable laws or non-compliance with this Code by any of the Corporation's directors, officers or employees. The Corporation's disclosure committee (the

16

"Committee") is generally responsible for the enforcement of the Code relating to officers and employees. The Audit Committee of the Board of Directors (or its designee) is generally responsible for enforcement of the Code relating to members of the Board of Directors. The Audit Committee may designate another Board committee or the full Board, as it deems appropriate, to handle the enforcement of a particular Code provision as it applies to members of the Board.

\*       \*       \*

When Code violations are determined to exist, appropriate corrective and disciplinary action will be taken, which may include one or more of the following measures, as applicable: (i) counseling; (ii) a warning; (iii) a reprimand noted in the employee's personnel file; (iv) probation; (v) change, including reassignment, in job responsibilities, authority and/or title; (vi) temporary suspension, with or without pay; (vii) termination of employment or other relationship with the Corporation; (viii) removal as a director or officer; (ix) reimbursement of losses or damages resulting from the violation; or (x) referral for criminal prosecution or civil action.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

42.    Sinclair, headquartered in Hunt Valley, Maryland, is the largest television station operator in the United States, both by number of stations and total coverage. The Company owns more than 193 stations across the country in 100 markets, covering 40% of American households.

43.    Since inception, the Smith family has had complete control over Sinclair. Sinclair has two classes of stock – Class A, which is entitled to one vote per share; and Class B, which is entitled to 10 votes per share. The Smith Brothers own all of the Company's Class B stock and roughly 33% of the Company's Class A stock, providing them with nearly 75% of the vote. Thus, the Smith Brothers have the right and power to control all matters brought to a shareholder vote, including the selection and election of all directors.

44.    According to the 2017 Proxy Statement, the Smith Brothers have entered into a shareholders' agreement pursuant to which they have agreed to vote for each other as candidates

for election to the Board until December 31, 2025.[3]  As a result, four of the Company's current eight directors are members of the Smith family.  Given the presence of a majority of directors affiliated with the Smith family, the Board has determined that Sinclair is a controlled company for purposes of NASDAQ listing requirements, which means the Board is not required to have an independent majority.

45.    The Company also admits that the Smith Brothers have the power to exert inordinate amounts of power over Sinclair, even if doing so would result in harm to minority stockholders.  According to the Company's 2017 Form 10-K, filed with the SEC on March 1, 2018, the Company admits that "circumstances may occur in which the interests of the Smiths, as controlling security holders, could be in conflict with the interests of other security holders and the Smiths would have the ability to cause [Sinclair] to take actions in their interest." Significantly, the Company further admits that "the Smiths could pursue acquisitions, divestitures, or other transactions that, in their judgment, could enhance *their* equity investment, *even though such transactions might involve risks to [Sinclair's] other security holders.*"

46.    Sinclair's business, like that of all television, wire, satellite and cable media companies, is governed by the rules and regulations set by the FCC.

47.    The FCC's National TV Ownership Rule prohibits the transfer of a license for a commercial television broadcast station if the transfer will result in the transferee having an attributable interest in television stations that reach greater than 39% of the national audience.  In calculating an interest holder's total ownership, the FCC's rules reduce the population attributed to a UHF television station – *i.e.*, stations broadcasting on channels 13 through 83 – by 50% (the

---

[3] *See* Ex. A at 7.

"UHF Discount"). Accounting for the UHF Discount, Sinclair stations purportedly reached approximately 25% of U.S. households.

48.     Moreover, the FCC's Local TV Multiple Ownership Rule, or "Duopoly Rule," provides that an entity cannot own more than two stations in the same Designated Market Area.

49.     Under the leadership of David Smith, Sinclair rapidly grew from a small footprint of just four cities in 1986 to, as noted above, become one of the largest television broadcast companies in the nation, reaching nearly 40% of American households.

50.     However, Sinclair's rapid expansion did not come without regulatory risks and penalties, and evidences the Company's history of skirting FCC ownership rules. Since the Company began rapidly expanding in the late 1990s, it began to receive pushback from regulators. In many transactions, Sinclair's acquisitions would have resulted in the Company exceeding legal ownership thresholds. To avoid triggering legal limits, regulators required Sinclair to divest certain stations in order to comply with antitrust laws and FCC rules.

51.     Rather than fully divest the television stations, however, Sinclair devised ways to keep control over the divested stations using legal loopholes known as sidecar arrangements. Sinclair would set up a shell company that would agree to buy the television broadcast license, and Sinclair would remain responsible for most of the station's operations. Sidecar arrangements typically entail several agreements[4] whereby the senior partner in the agreement (*i.e.*, Sinclair) buys a television station's facilities and assets but sells the license to a junior partner (*i.e.*, an affiliated shell company). Under these sidecar agreements, Sinclair generally retained control

---

[4] According to Sinclair's public filings, the Company has entered into agreements with other stations in certain markets, through which Sinclair provides programming and operating services pursuant to "local marketing agreements," or provide sales services or other non-programming operating services pursuant to outsourcing agreements, such as "joint sales agreements" and "shared service agreements."

over the finances, personnel, and programming of the station.  According to Media Matters, pursuant to the sidecar deals, Sinclair operated 48 stations in 23 states as of July 2018.

52.    The Individual Defendants knew that regulators were skeptical of deals that leave one broadcaster entangled in a station's operations because Sinclair has faced regulatory fines for maintaining *de facto* control over certain sidecar entities.  For example, in 2001, Sullivan Broadcast Holdings, Inc. proposed to sell its television stations to Sinclair and Cunningham (then known as Glencairn). The FCC ruled that Sinclair entered into transactions with Cunningham that were not executed at arms-length, allowing Sinclair to exercise *de facto* control over Cunningham. *See In the Matter of Edwin L. Edwards and Carolyn Smith et al.* (the "*2001 Glencairn Decision*").  As a result, Sinclair and Glencairn were required to pay $80,000 in fines to the FCC.

53.    The Individual Defendants have also known that, more recently, the FCC has taken an even harder line on sidecar arrangements, attributing sidecar stations to Sinclair under certain circumstances.  For instance, in 2014, the FCC began to increase scrutiny regarding the use of sidecar arrangements to evade its policies. The FCC started to make joint sales agreements count as ownership if the senior partner (*e.g.*, Sinclair) sold 15% or more of the advertising for its junior partner (the shell company), and to ban coordinated retransmission consent[5] negotiations between two of the top four stations in the market.  The Company's public filings, signed by the Board, disclosed the FCC's recent regulatory changes, and therefore the Board was aware of the FCC's increased scrutiny of sidecar arrangements.

---

[5] Retransmission consent is a provision of the 1992 United States Cable Television Consumer Protection and Competition Act that requires cable operators and other multichannel video programming distributors to get permission from broadcasters before carrying their programming.  Normally, cable operators negotiate fees paid to broadcasters in order to receive consent to carry the broadcasters' programming.

54.     The Individual Defendants were also specifically aware of the FCC's renewed regulatory interest in examining sidecar arrangements. For example, in July 2016, the FCC announced that Sinclair would pay $9.485 million to resolve several investigations, including the FCC's investigation into whether Sinclair had illegally renegotiated retransmission consent agreements for third party companies that Sinclair allegedly did not control. According to the FCC's investigation, Sinclair had negotiated retransmission consent on behalf of dozens of stations that it did not control while it was negotiating for its own stations in the same market, in violation of FCC rules.

55.     Thus, since at least 2001, the Individual Defendants have known that Sinclair's use of questionable third-party entities and sidecar agreements resulted in numerous fines by the FCC, all of which put the Company's fiduciaries on notice of the importance of divesting stations to ***independent third-party companies*** in order to comply with FCC rules.

B.     **Defendants Breach Their Fiduciary Duties By Engaging in a Scheme to Defraud the FCC, Tribune and Company Shareholders**

1.     **Sinclair Looks Forward to "Transformative" Mergers**

56.     On or around February 22, 2017, Sinclair disclosed its financial results for the fourth quarter of the 2016 fiscal year. During the Company's earnings call with investors, in response to a question by a Wells Fargo Securities LLC analyst about whether the Company expected any "transformative" merger deals at some point, Defendant Ripley stated:

> [A] lot of that will depend on what happens at the FCC and as I mentioned, we're quite optimistic about new leadership there and their plans to deregulate the industry and put us on an even playing field with other forms of communication. So we have to wait and see what will happen, ***but we think it will actually happen fairly quickly here and we'll start to see some movement this year. And if that happens, I do expect transformative deals to come on heels of that.***

57.     Shortly thereafter, on April 19, 2017, the FCC issued an order relaxing the FCC's National TV Ownership Rule by reinstating the UHF Discount that was previously eliminated under the Obama administration.

58.     Simultaneously, citing anonymous sources familiar with the discussions, media reports, including Bloomberg, reported that Sinclair was working on a deal to acquire Tribune "for a per-share price in the high 30s." Although the deal was not yet final, Sinclair had already been engaged in ongoing discussions about the terms of a merger and was aiming to announce the deal on or before May 8, 2017, when Tribune was scheduled to announce its first quarter 2018 financial results.

59.     According to Bloomberg, a combined Sinclair and Tribune company would reach more than 40% of American households, in violation of FCC Ownership rules, and as a result, any deal would require divestitures to *independent third parties.*

### 2.     Sinclair and Tribune Announce $3.9 Billion Merger

60.     On May 8, 2017, Sinclair and Tribune announced that they had entered into a definitive agreement under which Sinclair would acquire 100% of the issued and outstanding shares of Tribune for $43.50 per share, for an aggregate purchase price of approximately $3.9 billion, plus the assumption of approximately $2.7 billion in net debt.

61.     The Press Release announcing the merger stated, *"In order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations.  Such divestitures will be determined through the regulatory process."*

62.     On June 26, 2017, Sinclair and Tribune filed their Application for Approval of Proposed Merger and "Comprehensive Exhibit" with the FCC which, among other things,

explained that Sinclair and Tribune would sell certain stations to comply with FCC regulations. The application stated, in part, that:

> The applicants will take such actions to the extent required *to comply with the terms of the Merger Agreement and the national television ownership limit* (including the UHF Discount), in order to obtain FCC approval of the Transaction.

63.     On July 3, 2017, Sinclair filed a Registration Statement in connection with the Tribune Merger with the SEC on Form S-4, dated June 30, 2017.  The S-4 was signed by, among others, all of the Individual Defendants, including all four Smith Brothers.  The S-4 stated that:

> *Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.*
>
> In that connection, Sinclair agreed to divest one or more television stations in certain specified markets as necessary to comply with the FCC's Local Television Multiple Ownership Rule (47 C.F.R. § 73.3555(b)), which we refer to as the "FCC duopoly rule," or to obtain clearance under the HSR Act, in each case as required by the applicable governmental authority in order to obtain approval of and consummate the transactions. Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each market, as required by and subject to approval by the relevant governmental authority. *Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.*

64.     On August 15, 2017, Sinclair filed Amendment No. 1 to the Registration Statement on Form S-4/A.  The S-4/A was signed by, among others, all of the Individual Defendants, including all four Smith Brothers.  The S-4/A repeated the same misleading statements, again saying:

> *Sinclair also agreed, subject to the terms of the agreement, to use reasonable best efforts to take all actions to avoid or eliminate any impediment that may be asserted by a governmental authority with respect to the transactions so as to enable the closing to*

*occur as soon as reasonably practicable, including taking certain actions, each referred to as an "approval action," to obtain regulatory approval.*

Sinclair is required to designate either a Tribune station or Tribune stations or a Sinclair station or Sinclair stations for divestiture in each overlap market, as required by and subject to approval by the relevant governmental authority. *Sinclair has also agreed to designate, at its option, certain additional Tribune stations or Sinclair stations for divestiture and to divest such stations in order to comply with the FCC's National Television Multiple Ownership Rule (47 C.F.R. § 73.3555(e)), which we refer to as the "FCC national cap," as required by the FCC in order to obtain approval of and consummate the transactions.*

### 3. The FCC Seeks More Information on Sinclair's Proposed Divestitures

65.     On January 11, 2018, the FCC issued a letter pausing the informal timeline for consideration of applications for transfers of licenses or authorizations related to complex mergers until Sinclair and Tribune submitted additional information related to what divestitures the Companies would make to comply with FCC ownership regulations.

66.     On February 21, 2018, Sinclair filed an application with the FCC detailing the purported divestiture of twenty-three television stations ostensibly to comply with FCC ownership rules.

67.     However, as was ultimately discovered, many of the proposed "divestitures" were not divestitures at all, but were instead insider deals with buyers connected to Sinclair and the Smith Brothers personally. Moreover, these "divestitures" contained terms that allowed Sinclair to continue to exert its control over the stations in contravention of FCC ownership rules.

68.     For example, Sinclair proposed the sale of the New York television station WPIX-TV to Cunningham for approximately $15 million, far below its market value. At the time, Cunningham owned nearly twenty sidecar stations that were operated by companion Sinclair stations in the same market. Moreover, as of December 31, 2017, the estate of Carolyn Smith, the mother of Sinclair's controlling shareholders, the Smith Brothers, owned all of the

voting stock of Cunningham and the non-voting stock was owned by a trust benefiting the children of the Smith Brothers.

69.     In January 2018, in apparent anticipation of the Tribune Merger, the voting stock of Cunningham was sold to Michael Anderson, David Smith's former banker, for just $400,000, far below market value for the nearly twenty stations that Cunningham owns (the "Cunningham Transaction"). Even following the sale of Cunningham, Sinclair continued to guarantee almost $53.4 million of Cunningham's debt.

70.     Significantly, despite the overwhelming evidence to the contrary, Sinclair emphatically reassured the market that these were not improper deals, saying, ***"Cunningham is operated completely separately from Sinclair ... Sinclair will have no involvement in the operations of the Dallas and Houston stations being sold to Cunningham."***

71.     Next, Sinclair sought approval of the sale of one of Tribune's largest assets, WGN-TV in Chicago, for just $60 million, which again was significantly below market price. The buyer, WGN TV, LLC, was a newly formed company run by Fader, the chief executive officer of Atlantic. Fader had no previous broadcasting experience, and the controlling interest in Atlantic, according to Sinclair financial statements, belonged to David Smith.

72.     Even with the proposed sale, Sinclair would provide everything from programming to advertising sales to WGN TV, LLC, running the station through a services agreement in exchange for 30% of advertising sales and a $5.4 million monthly service fee, along with annual increases and performance bonuses. The sale of WGN also came with an option agreement, giving Sinclair the opportunity to buy the station back at the same price anytime within the next 48 years.

73.     Sinclair's proposed operating agreements with Cunningham and Fader further suggested that Sinclair employees would have responsibility for the "divested" stations' operations, including advertising sales and retransmission consent negotiations. Indeed, Sinclair would reap most of the economic benefits of the stations it was "divesting," including retransmission revenues.

74.     In response to the planned divestitures, market participants questioned whether the sales would satisfy the FCC rules. Numerous news outlets published articles expressing concern about the self-dealing and related-party nature of Sinclair's proposed divestitures.[6] According to *Variety*, "[t]he sale price of $15 million for a VHF station in the nation's largest TV market [New York] and $60 million for a VHF station in the No. 3 market [Chicago] was described as 'comical' by a broadcast TV veteran." The article noted that, in 2002, Fox paid *$425 million* to acquire WPWR-TV Chicago, a UHF station that was not nearly as strong in the market as WGN-TV.

75.     Further, Craig Aaron, president of the Washington, D.C.-based Free Press told *Variety*, "[t]his is their [Sinclair's] most brazen flouting of existing FCC rules." He went on to state, "The only role these supposed owners have is to sign everything away to Sinclair including all profits. These sham deals are in place only long enough so that Sinclair can lobby hard enough to get rid of the (ownership) rules and buy the stations back."

76.     According to the *Wall Street Journal* ("*WSJ*"), Sinclair was "encountering resistance from the [FCC]" given its close business ties to "the potential new owners of the spun-

---

[6] *See, e.g.*, Robert Channick, CHICAGO TRIBUNE, *Sinclair deal to sell WGN to chairman's business partner gives broadcaster control* (Mar. 1, 2018); Ben Munson, FIERCEVIDEO, *Sinclair plans $60M sale of WGN-TV to chairman's business partner* (Mar. 2, 2018); Cynthia Littleton, VARIETY, *Sinclair's 'Brazen' Plan to Sell New York, Chicago Stations With Strings Attached Draws Criticism* (Mar. 3, 2018); Gina Hall, NEW YORK BUSINESS JOURNAL, *Sinclair takes next steps to sell WGN-TV Chicago and WPIX-TV New York* (Mar. 7, 2018).

off stations.[7]  The *WSJ* noted that "[b]oth purchasers have long ties to Sinclair and its executive chairman, David Smith." Thus, as of at least March or April 2018, the Individual Defendants had clear warning from the FCC to avoid related party transactions involving Cunningham and WGN-TV, LLC. Any director acting in good faith would have complied with the law to ensure that the Tribune Merger would receive regulatory approval. However, the Individual Defendants did nothing to address the FCC's concerns.

77.     Rather, in response to the many, vocal critics of the "divestitures," Sinclair opted to rescind that divestiture and replace it with the divestiture of two Texas television stations, KIAH in Houston and KDAF in Dallas, to Cunningham for approximately $60 million, more than $40 million below market price for the two stations. Moreover, the "sales" of both Texas television stations were accompanied by an option agreement giving Sinclair the right to buy back the stations at the same price within eight years and renewable five times over.

78.     By comparison, Sinclair previously proposed to sell KPLR-TV in St. Louis to Meredith Corporation for $65 million. However, with respect to market size, KDAF was in the 5th largest designated market area ("DMA") and KIAH was in the 7th largest DMA, while KPLR was in the 21st largest DMA. Thus, despite the far greater value of the stations, Cunningham was paying for them as if they were worth *less than half* of KPLR. Nevertheless, Sinclair vehemently defended the sales as fully appropriate, issuing a statement assuring the market that "*[o]wnership rules are not being evaded; they are being complied with.*"

79.     These statements were intended to fraudulently conceal material adverse facts about the Company's business, operations, and prospects. In fact, Defendants hid from shareholders that: (i) the Tribune Merger was not in compliance with FCC rules and regulations;

---

[7] David Smith was aware of the *WSJ* reporting, as the article explicitly states that the reporter reached out to him seeking comment.

(ii) Sinclair was not using its best efforts to eliminate any impediment to regulatory approval; (iii) Sinclair was engaging in non-arm's length transactions with buyers connected to Sinclair's controlling shareholders in order to skirt FCC ownership rules; and (iv) the Board of Directors was conducting itself in a way that was contrary to the interests of shareholders in breach of their fiduciary duties.

80.    Indeed, market participants continued to question whether the sales would pass muster with the FCC. For instance, Chris Ruddy, chief executive of Newsmax Media Inc., said on July 4, 2018, "They're not really arm's-length. They're not really divestitures ... It's just really an insult to the public, to the rules, and to fairness." The attorneys general of Illinois, Iowa and Rhode Island told the FCC that "massive consolidation proposed in these applications violates the law." It was plainly evident that the planned divestitures, devised by the Smith Brothers and approved by the Company's Board – *i.e.*, the Smith Brothers and Defendants Friedman, Keith, Leader and McCanna – were related party transactions entered into for the benefit of the Smith Brothers.

81.    Further, the Smith Brothers and Defendants Keith and McCanna knew that the planned divestitures were related party transactions in violation of FCC rules because all of them had served on the Board since at least November 2001, when the FCC issued its *2001 Glencairn Decision*. As described above, Sinclair had already been found to exercise *de facto* control over Cunningham and, as a result, been subject to fines by the FCC. The *2001 Glencairn Decision* notified the relevant Board members that the FCC would find *de facto* control to exist where, as here, the transaction is far below fair value and Sinclair remained in control through sidecar arrangements and assumption of Cunningham's debt.

82.     Moreover, the Individual Defendants had knowledge that Cunningham and WGN-TV, LLC were considered, by the Company's own admission, "related persons."  In each and every public filing leading up to the submission of Sinclair's divestiture applications, the Company publicly identified Cunningham and Atlantic, run by Fader, as "related person[s]" due to extensive connections and ties with the Company's controlling stockholders, the Smith Brothers.[8]  The Smith Brothers and Defendants Friedman, Keith, Leader and McCanna had signed the Company's Form 10-Ks on February 28, 2017 and March 1, 2018 – both of which pre-dated submission of the FCC divestiture applications – that included descriptions of Cunningham's and Atlantic's entanglements with Sinclair.

83.     The Individual Defendants also had seen red flags notifying them that the proposed divestitures would not receive regulatory approval as early as April 2018, when the FCC had warned Sinclair that the Tribune Merger would not be approved *unless Sinclair ensured appropriate distance and independence from the companies to which the divestitures would be made.*

84.     News reports immediately criticized Sinclair for failing to fix the problems previously identified by the FCC earlier that month.[9]  Some critics called the divestiture plan a "total sham."  Other commentators drew the obvious comparison to the *2001 Glencairn Decision* in which the FCC shot down a set of sidecar agreements between Sinclair and Cunningham due,

---

[8] Sinclair Form 10-K, at F-44-45 (filed on Feb. 28, 2017) (identifying "Cunningham Broadcast Corporation" and "Atlantic Automotive Corporation" as related persons); Sinclair Form 10-Q, at 21-22 (filed on May 10, 2017) (same); Sinclair Form 10-Q, at 22-23 (filed on Aug. 9, 2017) (same); Sinclair Form 10-Q, at 24-25 (filed on Nov. 8, 2017) (same); Sinclair Form 10-K, at F-39-40 (filed on Mar. 1, 2018) (same); Sinclair Form 10-Q, at 22-23 (filed on May 10, 2018) (same).

[9] *See, e.g.*, CRAIN'S CHICAGO BUSINESS, *Sinclair agrees to sell WGN—but would still control it* (April 24, 2018); Ben Wofford, ROLLINGSTONE, *Sinclair Broadcasting's Hostile Takeover* (April 24, 2018); Jason Schwartz, POLITICO, *Armstrong Williams got 'sweetheart' deal from Sinclair* (June 13, 2018).

in part, to sales prices that were too low, on account that such low prices indicated that the deals were not legitimate, "arms-length" transactions.

85.     Despite repeated warnings, the Individual Defendants continued to pursue a divestiture plan in bad faith and in violation of FCC rules. These fiduciaries decided to pursue a strategy in the interests of the Smith Brothers, and at the expense of minority shareholders, with knowledge of the significant risk that the FCC would block the Tribune Merger. During this time, the Individual Defendants did nothing to ensure that Sinclair would: (i) submit truthful applications to the FCC; (ii) abide by the terms of its contractual agreement with Tribune to use best efforts to obtain regulatory approval; (iii) pursue divestitures in compliance with FCC rules; or (iv) issue truthful public disclosures regarding the Company's efforts to comply with FCC requests for lawful divestitures.

C.     **Sinclair's Omissions and Misrepresentations Result in the Collapse of the Tribune Merger**

86.     On May 21, 2018, the FCC began soliciting public comment on the amended Tribune Merger proposal and all of the proposed divestitures. The related person "sales" to Fader and Cunningham met vehement public opposition during the period for public comment, which lasted until July 12, 2018.

87.     On July 16, 2018, news reports disclosed that FCC Chairman Pai was circulating a draft HDO sending the Sinclair/Tribune deal to a hearing before the FCC's administrative law judge, a process widely considered to be a death sentence for merger approvals.

88.     Chairman Pai stated that "the evidence [the FCC] received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law." The draft HDO, seen by

Reuters on July 16, 2018, stated that Chairman Pai had "serious concerns" about the proposed merger, finding that "Sinclair's actions here potentially involve deception."

89.    Nevertheless, the Board of Directors and the Company continued to lie to shareholders, issuing its own statement that same day[10] touting that its proposed divestitures were both legal and consistent with sales the FCC had approved in the past:

> Throughout the FCC review process of this transaction, we have had numerous meetings and discussions with the FCC's Media Bureau to make sure that they were fully aware of the transaction's structure and basis for complying with FCC rules and meeting public interest obligations … *These structures are consistent with structures that Sinclair and many other broadcasters have utilized for many years with the full approval of the FCC. During these discussions and in our filings with the FCC, we have been completely transparent about every aspect of the proposed transaction.*

90.    On July 18, 2018, in a last-ditch effort to stop the proposed merger from going to a hearing, Sinclair filed an Amended Application for Consent to Transfer Control of Licenses and Authorizations with the FCC, notifying the FCC that it was withdrawing its application to divest WGN-TV in Chicago, KIAH in Houston and KDAF in Dallas.

91.    The withdrawal did nothing to persuade the FCC which, after markets closed on July 18, 2018, voted unanimously to send the proposed merger to a hearing anyway.  The FCC's final HDO Order (the "Order"), made public on July 19, 2018, stated that "there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts" and questioned whether Sinclair had "attempted to skirt the Commission's broadcast ownership rules."

---

[10] *See* http://sbgi.net/wp-content/uploads/2018/07/Statement-regarding-FCC1.pdf (last accessed November 29, 2018).

92.     The Order additionally stated that "the record raises significant questions as to whether those proposed divestitures were in fact 'sham' transactions," and took particular issue with the proposed sale of WGN in Chicago:

> Sinclair would have owned most of WGN-TV's assets, and pursuant to a number of agreements, would have been responsible for many aspects of the station's operation.   Finally, Fader would have purchased WGN-TV at a price that appeared to be significantly below market value, and Sinclair would have had an option to buy back the station in the future.   Such facts raise questions about whether Sinclair was the real party in interest under Commission rules and precedents and attempted to skirt the Commission's broadcast ownership rules.

93.     Similarly, in describing the Cunningham Transaction, the Order stated:

> [P]roblematic aspects of the proposed divestitures of the Texas stations include: the intertwined relationship between Sinclair and Cunningham, particularly in light of past Commission findings regarding the nature of the relationship; the recent acquisition of the voting shares of Cunningham by Michael Anderson, a Sinclair associate, for a $400,000 sales price that is far below market value; the fact that the children of Sinclair's controlling shareholders are beneficiaries of trusts controlling the non-voting shares of Cunningham with the parents holding options to buy the voting shares in the future; and Sinclair's apparent guarantee of $53.6 million of Cunningham's debt.

94.     Over the course of just *four* trading days from July 16 to July 19, 2018, Sinclair's share price plummeted *more than 20%* as a result of the misconduct of its Board.

95.     As a result of the forgoing, on August 9, 2018, Tribune announced its withdrawal from the $3.9 billion merger and said that it had filed a lawsuit in the Delaware Chancery Court against Sinclair seeking $1 billion in damages for losses incurred as a result of Sinclair's "spectacular" "material breaches" of their merger agreement.

96.     As Tribune's Complaint alleges:

> To prevent Sinclair from engaging in protracted negotiations or in any other behavior that would delay the Merger's closing, *the Merger Agreement required Sinclair to agree to divestures to avoid even the threat of any proceeding or order relating to regulatory review.*

However, from virtually the moment the Merger Agreement was signed, Sinclair repeatedly and willfully breached its contractual obligations in spectacular fashion. *In an effort to maintain control over stations it was obligated to sell if advisable to obtain regulatory clearance, Sinclair engaged in belligerent and unnecessarily protracted negotiations with DOJ and the FCC over regulatory requirements, refused to sell stations in the ten specified markets required to obtain approval, and proposed aggressive divestment structures and related party sales that were either rejected outright or posed a high risk of rejection and delay – all in the service of Sinclair's self-interest and in derogation of its contractual obligations.*

### D.    Sinclair's Actions Puts the Company's Broadcast Licenses at Risk

97.    The failed Tribune Merger, though it created concrete and identifiable damages that exist today, may have a far more profound impact on Sinclair in the future. Under FCC rules, when a station seeks the grant or renewal of broadcast licenses, the FCC must examine the station's *character*, among other things, before granting or renewing the license. The policy underlying the FCC's consideration of a licensee's character is meant to determine whether an applicant would *"deal truthfully"* with the FCC and has a "propensity to comply with the law generally." Indeed, the FCC's July 19, 2018 HDO Order made clear that future applications by Sinclair could be subject to rejection because they "would not be in the public interest."

98.    Sinclair's misconduct in connection with the Tribune Merger may lead the FCC to question the Company's character, or whether the Company's applications for renewed broadcast licenses would be in the public interest, which in turn could lead to the FCC refusing to grant new licenses to Sinclair or renew Sinclair's already-owned licenses. Given the value of many of Sinclair's stations, such actions by the FCC could be catastrophic for the Company.

## VI.    BREACHES OF FIDUCIARY DUTIES

99.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sinclair, an absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who also were officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised Sinclair's Board.

100.    The Individual Defendants breached their duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets, by allowing Defendants to cause, or by themselves causing, the Company to engage in wrongful conduct by attempting to skirt the FCC's broadcast ownership rules in conjunction with the Tribune Merger, as detailed herein. In addition, as a result of Defendants' course of conduct, the Company is now the subject of multiple securities class action lawsuits alleging securities law violations in connection with the aforementioned wrongful conduct. As a result, Sinclair has expended, and will continue to expend, significant sums of money.

101.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

102.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and/or did: (i) conceal the fact that the Company had engaged in improper practices with respect to the FCC's ownership requirements and antitrust regulations; (ii) enhance the profits and power that the Individual Defendants enjoyed as a result of holding their executive and directorial positions; and (iii) deceive the investing public, including stockholders of Sinclair, regarding the Individual Defendants' management of Sinclair's operations. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

103.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to fail to disclose the improper practices with respect to the FCC's ownership requirements and antitrust regulations, which negatively impacted the Company's performance.

104.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of their fiduciary duties, unjust enrichment, and to conceal adverse information concerning the Company's operations and future business prospects, particularly with respect to the Tribune Merger.

105.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and

substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

106.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.   DAMAGES

107.    As alleged herein, the Individual Defendants breached their fiduciary duties of care, loyalty and good faith by causing Sinclair to: (i) engage in a scheme of making sham transactions to circumvent FCC rules and regulations; (ii) make false and misleading statements and omissions to the FCC in furtherance of this scheme; (iii) breach the Company's merger agreement with Tribune by failing to make reasonable efforts to ensure government approval of the Tribune Merger; and (iv) make false and misleading statements and omissions in the Company's public filings, thereby exposing Sinclair to substantial liability.

108.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Sinclair engaged in improper conduct in an effort to skirt the FCC's ownership rules, thereby eliminating a significant business opportunity presented by the Tribune Merger and costing the Company hundreds of millions, if not billions of dollars in damages in the form of direct damages, consequential damages, lost profits, and exemplary damages.  Further, the improper statements disseminated by the Company in furtherance of this improper conduct have devastated Sinclair's credibility, imperiling the Company's future ability to obtain and maintain

broadcast licenses. Additionally, Sinclair is now the subject of multiple securities class actions alleging securities laws violations in connection with the false and misleading statements plead herein. Further, as of September 7, 2018, the FCC was still reviewing Sinclair's actions related to the Tribune Merger.[11] Moreover, the failed Tribune Merger triggered a broader investigation by the U.S. Department of Justice ("DOJ") into whether the Company had violated antitrust laws by sharing ad sales information with other broadcasting companies.[12] Sinclair reached a settlement with the DOJ on November 13, 2018, requiring the Company to expend further assets to maintain its antitrust compliance.[13]

109.    Sinclair also paid substantial compensation to directors and officers who breached their fiduciary duties. The retention of these payments by the Individual Defendants is unfair and unjust.

## VIII.   DERIVATIVE AND DEMAND ALLEGATIONS

110.    Plaintiff brings this action derivatively in the right and for the benefit of Sinclair to redress injuries suffered, and to be suffered, by Sinclair as a direct result of breaches of fiduciary duties and unjust enrichment by the Individual Defendants. Sinclair is named as a nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111.    Plaintiff will adequately and fairly represent the interests of Sinclair in enforcing and prosecuting its rights.

---

[11] *See* https://www.law360.com/articles/1084322/pai-says-fcc-still-probing-sinclair-s-honesty-in-tribune-deal (last accessed November 28, 2018).
[12] *See* Joe Flint, WALL STREET JOURNAL, *Tribune Terminates $3.9 Billion Merger With Rival Sinclair* (August 9, 2018).
[13] *See* https://www.justice.gov/atr/case-document/file/1110666/download (last accessed November 28, 2018).

112.    Plaintiff was a stockholder of Sinclair at the time of the wrongdoing complained of, has continuously been a stockholder, and is a current Sinclair stockholder.

113.    Pursuant to Maryland law, before bringing a derivative suit in Maryland, a stockholder must either make a demand on the Board that the corporation bring the suit, or else show that demand is excused as futile.[14]

114.    Here, demand was plainly futile – the Smith Brothers, whom the insider deals were designed to personally benefit, constitute four of the eight members of the Board, and therefore a majority of the Board cannot impartially assess and vote to pursue the claims asserted herein.   Under traditional rules of board governance, an equally divided vote on a motion to sue has the same effect as a vote in which the motion is defeated by a one-vote majority.   In either case, the motion is unsuccessful and does not become corporate policy.   Thus, because a majority of the Board is not independent and disinterested, the Board is so personally conflicted and committed to the failed transactions at issue herein that they could not be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

115.    Moreover, the remaining directors are incapable of impartially assessing a demand because they are personally and directly conflicted due to the Smith Brothers' domination and control over the Board.   As alleged above, and based on public statements *by the Company in its SEC filings*,[15] the Smith Brothers are the controlling shareholders of Sinclair with the power and authority to act to promote their own self-interests over the interests of the Company and its minority shareholders.   The Board admits that the Smith Brothers can take such action and, as alleged above, did take such action, despite it representing a blatant breach of

---

[14] "Before bringing a derivative suit in Maryland . . . the shareholder must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile." *Bender v. Schwartz*, 172 Md. App. 648, 666, 917 A.2d 142, 152 (2007).

[15] *See, e.g.*, Ex. A at 4.

fiduciary duty. Accordingly, the remaining directors are so committed to the transactions due to the Smith Brothers' domination and control over Sinclair that they are incapable of assessing a demand in good faith.

116.    Nevertheless, in an abundance of caution, before filing this derivative action, Plaintiff first demanded that the Board take action to investigate and redress the misconduct alleged herein (the "Demand").

117.    Specifically, on August 24, 2018, Plaintiff sent the Demand to the Board to take action to remedy the harm to Sinclair caused by certain of the Company's officers and directors who violated and caused the Company to violate Maryland law, and who accordingly caused the damages and harms the Company has suffered in connection with the events detailed herein. A true and correct copy of the Demand is attached hereto as **Exhibit B**.

118.    As of the time of the filing of this Complaint, the Company has not responded to Plaintiff's August 24, 2018 Demand, aside from an August 28, 2018 letter from outside counsel to Sinclair, which stated that a representative of the Company "will contact you" once the Board "has reviewed and considered the matters raised" in the Demand. A true and correct copy of the August 28, 2018 letter is attached hereto as **Exhibit C**.

119.    As ninety days have expired since the date the Demand was made, Plaintiff rightfully files this shareholder derivative action, and this Complaint, on behalf of the Company.

## IX.    COUNTS AGAINST DEFENDANTS

### COUNT I
### Against the Smith Brothers for Breach of Fiduciary Duties

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    The Smith Brothers owed and continue to owe Sinclair fiduciary obligations.  By reason of their fiduciary relationships, the Smith Brothers owed and continue to owe Sinclair the highest obligation of due care, loyalty, and good faith.

122.    The Smith Brothers, and each of them, violated and breached their fiduciary duties by, *inter alia*, (i) consciously and willfully pursuing related person transactions for their own benefit, at the expense of minority shareholders and in violation of FCC rules; (ii) consciously submitting untruthful applications for approval of these divestiture transactions to the FCC; (iii) willfully failing to adhere to the terms of the Company's merger agreement with Tribune, including the willful failure to make best efforts to obtain regulatory approval of the Tribune Merger; and (iv) knowingly issuing false or misleading statements or omissions of material fact to Sinclair shareholders regarding the Company's efforts to comply with FCC rules.

123.    As a direct and proximate result of the Smith Brothers' failure to perform their fiduciary obligations, Sinclair has sustained, and will continue to sustain, significant damages, both financially and to its corporate goodwill and image.  As a result of the misconduct alleged herein, the Smith Brothers are liable to the Company.

## COUNT II
### Against Defendants Friedman, Keith, Leader and McCanna for Breach of Fiduciary Duties

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    Defendants Friedman, Keith, Leader and McCanna (collectively, the "Independent Director Defendants") owed and continue to owe Sinclair fiduciary obligations. By reason of their fiduciary relationships, the Independent Director Defendants owed and continue to owe Sinclair the highest obligation of due care, loyalty, and good faith.

126.    Defendant Friedman has been on notice from 2016, at the latest, that violations of FCC rules would result in investigations and penalties, as they did in July 2016, when the FCC announced that Sinclair would pay $9.485 million to resolve several investigations into Sinclair's purported violations of FCC rules.  Defendant Leader has been on notice from 2014, at the latest, that the FCC had increased its scrutiny of sidecar arrangements, which were disclosed by the Board in the Company's public filings.  Defendants Keith and McCanna have been on notice from at least 2001 that Sinclair's use of questionable third-party entities and sidecar agreements resulted in numerous fines by the FCC, including the *2001 Glencairn Decision*, all of which put them on notice of the importance of divesting stations to independent third-party companies in order to comply with FCC rules.

127.    In addition, all four Independent Director Defendants, and each of them, have been and continue to be subject to the Company's Code of Business Conduct and Ethics, which required them to: (i) refrain from engaging in any activity or practice in conflict with the interests of the Company; (ii) comply with FCC rules and regulations; (iii) report actual or potential conflicts of interest, violations of applicable laws or non-compliance with the Code by any of the Company's directors or officers; and (iv) where violations of the Code occur, take appropriate corrective action.  As alleged herein, the Independent Director Defendants failed to adhere to the Company's Code of Business Conduct and Ethics, and thereby violated and breached their fiduciary duties to the Company.

128.    Further, Defendants Keith, Leader and McCanna sat on the Board's Audit Committee, which was tasked with, *inter alia*, approving or ratifying related person transactions pursuant to Sinclair's related person transaction policy.  The Audit Committee was only to approve or ratify related person transactions where, under all of the circumstances, such

41

transactions were in – or not inconsistent with – the best interests of the Company. Because the Audit Committee approved or ratified, or otherwise failed to prevent, the related person transactions that violated FCC rules and thereby caused the Tribune Merger to fail, Defendants Keith, Leader and McCanna, and each of them, violated and breached their fiduciary duties to the Company.

129.    The Independent Director Defendants, and each of them, further violated and breached their fiduciary duties by, *inter alia*, (i) consciously and willfully approving related person transactions for the benefit of the Smith Brothers, at the expense of minority shareholders and in violation of FCC rules; (ii) consciously submitting untruthful applications for approval of these divestiture transactions to the FCC; (iii) willfully failing to adhere to the terms of the Company's merger agreement with Tribune, including the willful failure to make best efforts to obtain regulatory approval of the Tribune Merger; and (iv) knowingly issuing false or misleading statements or omissions of material fact to Sinclair shareholders regarding the Company's efforts to comply with FCC rules.

130.    As a direct and proximate result of the Independent Director Defendants' failure to perform their fiduciary obligations, Sinclair has sustained, and will continue to sustain, significant damages, both financially and to its corporate goodwill and image. As a result of the misconduct alleged herein, the Independent Director Defendants are liable to the Company.

## COUNT III
**Against Defendants Ripley, David Smith, J. Duncan Smith and Robert Smith
for Breach of Fiduciary Duties**

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    Defendants Ripley, David Smith, J. Duncan Smith and Robert Smith (collectively, the "Officer Defendants") owed and continue to owe Sinclair fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants owed and continue to owe Sinclair the highest obligation of due care, loyalty, and good faith.

133.    The Officer Defendants, and each of them, violated and breached their fiduciary duties by, *inter alia*, (i) consciously and willfully pursuing related person transactions for the benefit of the Smith Brothers, at the expense of minority shareholders and in violation of FCC rules; (ii) consciously submitting untruthful applications for approval of these divestiture transactions to the FCC; (iii) willfully failing to adhere to the terms of the Company's merger agreement with Tribune, including the willful failure to make best efforts to obtain regulatory approval of the Tribune Merger; and (iv) knowingly issuing false or misleading statements or omissions of material fact to Sinclair shareholders regarding the Company's efforts to comply with FCC rules.

134.    As a direct and proximate result of the Officer Defendants' failure to perform their fiduciary obligations, Sinclair has sustained, and will continue to sustain, significant damages, both financially and to its corporate goodwill and image.  As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Sinclair.  The Individual Defendants were

unjustly enriched as a result of the salaries, bonuses, and other forms of compensation they received while breaching their fiduciary duties owed to Sinclair.

137.    Plaintiff, on behalf of Sinclair, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, for their wrongful conduct and fiduciary breaches.

138.    Plaintiff, on behalf of Sinclair, has no adequate remedy at law.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

A.    Finding that the Individual Defendants breached their fiduciary duties to Sinclair in connection with the Tribune Merger and regulatory approval process;

B.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Awarding to Sinclair restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, consultants', accountants', and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

Michael Paul Smith, Esq.
Melissa L. English, Esq.
**Smith, Gildea & Schmidt, LLC**
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070 / (410) 821-0071 (fax)
Email: mpsmith@sgs-law.com
menglish@sgs-law.com
Counsel for Plaintiff

*Pro Hac Vice Application Pending:*

Frank R. Schirripa
Daniel B. Rehns
**HACH ROSE SCHIRRIPA
& CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
(212) 213-8311 / (212) 779-0028 (fax)
fschirripa@hrsclaw.com
drehns@hrsclaw.com
spavsner@hrsclaw.com

Counsel for Plaintiff

December 6, 2018

# EXHIBIT A

**EDGAR pro**
by EDGAR Online

# SINCLAIR BROADCAST GROUP INC

# FORM DEF 14A
## (Proxy Statement (definitive))

# Filed 04/26/18 for the Period Ending 12/31/17

| | |
|---|---|
| Address | 10706 BEAVER DAM ROAD |
| | HUNT VALLEY, MD, 21030 |
| Telephone | 4105681500 |
| CIK | 0000912752 |
| Symbol | SBGI |
| SIC Code | 4833 - Television Broadcasting Stations |
| Industry | Broadcasting |
| Sector | Consumer Cyclicals |
| Fiscal Year | 12/31 |

Powered By **EDGAR**Online

http://www.edgar-online.com

© Copyright 2018, EDGAR Online, a division of Donnelley Financial Solutions. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, a division of Donnelley Financial Solutions, Terms of Use.

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
- ☐  Preliminary Proxy Statement
- ☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
- ☒  Definitive Proxy Statement
- ☐  Definitive Additional Materials
- ☐  Soliciting Material under §240.14a-12

---

### SINCLAIR BROADCAST GROUP, INC.

(Name of Registrant as Specified In Its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

---

Payment of Filing Fee (Check the appropriate box):
- ☒  No fee required.
- ☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
    - (1)  Title of each class of securities to which transaction applies:

      N/A
    - (2)  Aggregate number of securities to which transaction applies:

      N/A
    - (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

      N/A
    - (4)  Proposed maximum aggregate value of transaction:

      N/A
    - (5)  Total fee paid:

      N/A

- ☐  Fee paid previously with preliminary materials.
- ☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
    - (1)  Amount Previously Paid:

      N/A
    - (2)  Form, Schedule or Registration Statement No.:

      N/A
    - (3)  Filing Party:

      N/A
    - (4)  Date Filed:

      N/A



# SINCLAIR
## B R O A D C A S T   G R O U P

April 26, 2018

Dear Shareholder:

You are cordially invited to attend the annual meeting of shareholders of Sinclair Broadcast Group, Inc. The annual meeting on June 7, 2018 will be held at Sinclair's corporate office, 10706 Beaver Dam Road, Hunt Valley, Maryland 21030 at 10:00 a.m. local time.

Enclosed with this letter is a notice of the annual meeting of shareholders, a proxy statement, a proxy card and a return envelope. Also enclosed with this letter is Sinclair Broadcast Group, Inc.'s Annual Report to shareholders for the year ended December 31, 2017

Your vote on these matters is very important. We urge you to review carefully the enclosed materials and to return your proxy promptly. The proxy materials are also available at
http://www.astproxyportal.com/ast/26141.

You are cordially invited to attend the annual meeting and you may vote in person even though you have returned your proxy card. Whether or not you plan to attend the annual meeting, please sign and promptly return your proxy card in the enclosed postage paid envelope.

Sincerely,

David D. Smith
Chairman of the Board
and Executive Chairman

*IF YOU PLAN TO ATTEND:*

*Please note that space limitations make it necessary to limit attendance at the meeting to our shareholders of record as of March 15, 2018 . Registration will begin at 9:30 a.m. and seating will begin at 9:45 a.m. Each shareholder may be asked to present valid picture identification, such as a driver's license or passport. Shareholders holding stock in brokerage accounts ("street name" holders) will need to bring a copy of a brokerage statement reflecting stock ownership as of March 15, 2018 (record date). Cameras (including the use of cellular/smart phones with photographic capabilities), recording devices and other electronic devices will not be permitted at the meeting.*

**YOUR VOTE IS IMPORTANT—Please execute and return the enclosed proxy card
promptly, whether or not you plan to attend the
Sinclair Broadcast Group, Inc. annual meeting.**

**SINCLAIR BROADCAST GROUP, INC.**
10706 Beaver Dam Road
Hunt Valley, Maryland 21030

# NOTICE OF ANNUAL MEETING OF SHAREHOLDERS

**Important notice regarding the availability of proxy materials
for the shareholder meeting to be held on June 7, 2018 .**

**The proxy statement and 2017 annual report to shareholders are available at
http://www.astproxyportal.com/ast/26141.**

Dear Shareholders:

The annual meeting of Sinclair Broadcast Group, Inc. (sometimes referred to in this Proxy Statement as the "Company" or "we" or "us") will be held on June 7, 2018 at our corporate office, 10706 Beaver Dam Road, Hunt Valley, Maryland 21030 at 10:00 a.m. local time for the following purposes:

1    The election of eight directors, each for a one-year term;

2    The ratification of the appointment of PricewaterhouseCoopers, LLP as our independent registered public accounting firm for the year ending December 31, 2018 ; and

3    The consideration of any other matters as may properly come before the annual meeting.

You will be able to vote your shares at the annual meeting if you were a shareholder of record at the close of business on March 15, 2018 . Your vote at the annual meeting is very important to us.

BY ORDER OF THE BOARD OF DIRECTORS

J. Duncan Smith, Secretary

Baltimore, Maryland
April 26, 2018

## TABLE OF CONTENTS

| | Page |
|---|---|
| INFORMATION ABOUT THE 2018 ANNUAL MEETING AND VOTING | 1 |
| PROPOSAL 1: ELECTION OF DIRECTORS | 3 |
| PROPOSAL 2: RATIFICATION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 3 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 4 |
| DIRECTORS, EXECUTIVE OFFICERS AND KEY EMPLOYEES | 7 |
| CORPORATE GOVERNANCE | 12 |
| DIRECTOR COMPENSATION | 15 |
| COMPENSATION DISCUSSION AND ANALYSIS | 16 |
| SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE | 31 |
| RELATED PERSON TRANSACTIONS | 32 |
| AUDIT COMMITTEE, AUDIT FEES AND AUDITOR INDEPENDENCE | 33 |
| SHAREHOLDER PROPOSALS | 35 |

## INFORMATION ABOUT THE 2018 ANNUAL MEETING AND VOTING

### The Annual Meeting

The annual meeting will be held on June 7, 2018 at our corporate office, 10706 Beaver Dam Road, Hunt Valley, Maryland 21030 at 10:00 a.m. local time.

### This Proxy Solicitation

For most of our shareholders, we are furnishing proxy materials including this proxy statement and our 2017 annual report to shareholders, which includes our Annual Report on Form 10-K for the year ended December 31, 2017 , to each person who was an owner of our common shares as of the close of business on March 15, 2018 by providing access to such documents on the Internet instead of mailing printed copies unless you previously requested to receive these materials by mail or e-mail. On or about April 26, 2018 , we mailed to most of our shareholders who have not previously requested to receive these materials by mail or e-mail a "Notice of Internet Availability of Proxy Materials" ("Notice") containing instructions on how to access and review this proxy statement and our annual report and how to submit votes on the Internet or by telephone. You cannot vote by marking the Notice and returning it. If you received the Notice by mail, you will not automatically receive a printed copy of our proxy materials or annual report unless you follow the instructions for requesting these materials included in the Notice.

We are sending you this proxy statement because our Board of Directors is seeking a proxy to vote your shares at the annual meeting. This proxy statement is intended to assist you in deciding how to vote your shares. Proxy materials are also available at http://www.astproxyportal.com/ast/26141.

We are paying the cost of soliciting these proxies. Our directors, officers and employees may request proxies in person or by telephone, mail, or letter. We will reimburse brokers and other nominees for their reasonable out-of-pocket expenses for forwarding proxy materials to beneficial owners of our common shares.

### Voting Your Shares

**Shareholders of Record** . You may vote your shares at the annual meeting either in person or by proxy. To vote in person, you must attend the annual meeting and obtain and submit a ballot. Ballots for registered shareholders to vote in person will be available at the annual meeting. If your shares are registered directly in your name with our transfer agent, American Stock Transfer & Trust Company, LLC, you are considered the *registered* holder of those shares. As the *registered* stockholder, you can ensure your shares are voted at the meeting by completing, signing, dating and returning the enclosed proxy card in the envelope provided.

If you complete the proxy card, except for the voting instructions, then your shares will be voted FOR each of the director nominees identified on the proxy card and FOR ratification of the selection of PricewaterhouseCoopers, LLP as our independent registered public accounting firm for 2018 .

We have described in this proxy statement all the proposals that we expect will be made at the annual meeting. If either a shareholder or we properly present any other proposal at the meeting, we will use your proxy to vote your shares on the proposal in our best judgment.

Your proxy card will be valid only if you sign, date and return it in time for it to be received by us before the annual meeting scheduled to be held on June 7, 2018

**Beneficial Owners**  Most of our stockholders hold their shares through a broker, bank, trustee or another nominee, rather than registered directly in their name (which is often referred to as "street name"). In that case, you are considered the *beneficial owner* of shares held in street name, and the proxy materials, including a notice enabling you to receive proxy material through the mail, are being forwarded to you by your broker, bank, trustee or nominee. As the *beneficial owner* , you are entitled to direct the voting of your shares by your intermediary. Brokers, banks and nominees typically offer telephonic or electronic means by which the *beneficial owners* of shares held by them can submit voting instructions, in addition to the traditional mailed voting instruction cards. If you are a *beneficial owner* of shares, you cannot vote in person at the annual meeting unless you have a proper power of attorney from your broker. Votes directed through a broker must be received by us before the annual meeting.

If you hold your shares in street name with a broker and you do not tell your broker how to vote or provide the broker with a voting instruction form, your broker cannot vote on your behalf for the election of director nominees (Proposal 1).

1

**Revoking Your Proxy**

If you decide to change your vote, you may revoke your proxy at any time before it is voted at the annual meeting. You may revoke your proxy by any one of three ways:

- you may notify our Secretary in writing that you wish to revoke your proxy at the following address: Sinclair Broadcast Group, Inc., 10706 Beaver Dam Road, Hunt Valley, Maryland, 21030, Attention: J. Duncan Smith, Vice President and Secretary. We must receive your notice before the time of the annual meeting;

- you may submit a proxy dated later than your original proxy; or

- you may attend the annual meeting and vote, but merely attending the annual meeting will not by itself revoke a proxy; you must: (i) obtain a ballot and vote your shares to revoke the proxy; and (ii) in the case of shares held in street name, you must obtain a proper power of attorney from your broker to vote your shares.

**Vote Required for Approval**

*Shares Entitled to Vote*  On March 15, 2018 (the record date), the following shares were issued and outstanding and had the votes indicated:

- 76,509,574 shares of Class A Common Stock, each of which is entitled to one vote on each of the proposals; and
- 25,670,684 shares of Class B Common Stock, each of which is entitled to ten votes on each of the proposals.

*Quorum* . A majority of the outstanding shares of common stock entitled to vote, or a "quorum," must be present at the annual meeting in order to transact business. A quorum will be present if 166,608,208 votes are represented at the annual meeting, either in person (by the shareholders) or by proxy. If a quorum is not present, a vote cannot occur. In deciding whether a quorum is present, abstentions and broker non-votes (where a broker or nominee is not permitted to vote on a matter and has not received voting instructions from the beneficial owner) will be counted as shares that are represented at the annual meeting.

*Votes Required* . The votes required on each of the proposals are as follows:

| | |
|---|---|
| Proposal 1: Election of Eight Directors | The eight nominees for director who receive the most votes will be elected. This is called a "plurality." If you indicate "withhold authority to vote" for a particular nominee on your proxy card, your vote will not count either for or against the nominee. Broker non-votes are not counted as votes cast for nominees for director and will not affect the outcome of the proposal. |
| Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm | The affirmative vote of a majority of the votes cast at the annual meeting is required to ratify the Audit Committee's selection of the independent registered public accounting firm. If you abstain from voting, your abstention will not count as a vote cast for or against the proposal. |

**Additional Information**

We are making available our annual report for the year ended December 31, 2017 , including consolidated financial statements, to all shareholders entitled to vote at the annual meeting together with this proxy statement. The annual report includes details on how to get additional information about us. The annual report does not constitute a part of the proxy solicitation material. Proxy materials are also available to registered shareholders and to beneficial owners at http://www.astproxyportal.com/ast/26141.

2

## PROPOSAL 1: ELECTION OF DIRECTORS

Nominees for election to the Board of Directors are:

David D. Smith
Frederick G. Smith
J. Duncan Smith
Robert E. Smith
Howard E. Friedman
Daniel C. Keith
Martin R. Leader
Lawrence E. McCanna

Each director will be elected to serve for a one-year term, unless he resigns or is removed before his term expires, or until his replacement is elected and qualified. Each of the nominees listed above is currently a member of the Board of Directors and each of them has consented to serve as a director if elected. More detailed information about each of the nominees is available in the section of this proxy statement titled *Directors, Executive Officers and Key Employees* .

If any of the nominees cannot serve for any reason (which is not anticipated), the Board of Directors may designate a substitute nominee or nominees. If a substitute is nominated, we will vote all valid proxies for the election of the substitute nominee or nominees. Alternatively, the Board of Directors may also decide to leave the board seat or seats open until a suitable candidate or candidates are located, or it may decide to reduce the size of the Board.

The Amended and Restated Certificate of Incorporation provides that our business shall be managed by a Board of Directors of not less than three and not more than thirteen directors with the number of directors to be fixed by the Board of Directors from time to time. The Board of Directors has presently established the size of the Board at eight members. Proxies for the annual meeting may not be voted for more than eight nominees.

Messrs. David D. Smith, J. Duncan Smith, Robert E. Smith and Dr. Frederick G. Smith (collectively, the "Controlling Shareholders") are brothers and have entered into a stockholders' agreement pursuant to which they have agreed to vote for each other as candidates for election to the Board of Directors until December 31, 2025. The Controlling Shareholders own collectively 74.8% of the total voting power as of March 31, 2018 .

**The Board of Directors recommends a vote FOR each of the nominees to the Board of Directors.**

## PROPOSAL 2: RATIFICATION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Audit Committee of the Board of Directors has sole responsibility for the selection of our independent registered public accounting firm and has appointed PricewaterhouseCoopers, LLP (PricewaterhouseCoopers) as our independent registered public accounting firm for the fiscal year ending December 31, 2018 . The Board of Directors recommends ratification of this appointment by the shareholders. If the shareholders do not ratify the appointment of PricewaterhouseCoopers, the Audit Committee will reevaluate the engagement of the independent registered public accounting firm. Even if the appointment is ratified, the Audit Committee, in its discretion, may nevertheless appoint another independent registered public accounting firm at any time during the year if the Audit Committee determines that such a change would be in the best interests of the shareholders. PricewaterhouseCoopers audited the Company's financial statements for the fiscal year ended December 31, 2017 .

A representative of PricewaterhouseCoopers is expected to attend the annual meeting. The PricewaterhouseCoopers representative will have the opportunity to make a statement if he or she desires to do so and will be able to respond to appropriate questions from shareholders.

**The Board of Directors recommends a vote FOR ratification of the appointment of PricewaterhouseCoopers, LLP.**

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

There were 102,180,258 shares of our common stock issued and outstanding on March 31, 2018 , consisting of 76,509,574 shares of Class A Common Stock and 25,670,684 shares of Class B Common Stock. The following table shows how many shares were owned by the following categories of persons as of that date:

- persons known to us who beneficially own more than 5% of the shares;
- each director and each executive officer described on the "Summary Compensation Table"; and
- directors and all executive officers as a group.

| Name | Shares of Class B Common Stock Beneficially Owned (a) | | Shares of Class A Common Stock Beneficially Owned | | Percent of Total Voting Power (c) |
|---|---|---|---|---|---|
| | Number | Percent | Number | Percent (b) | |
| David D. Smith † | 7,211,072 | 28.1% | 11,058,424  (d) | 12.8% | 22.6% |
| J. Duncan Smith † | 7,073,466 | 27.6% | 7,106,218  (e) | 8.5% | 21.0% |
| Robert E. Smith † | 6,474,806 | 25.2% | 6,491,461  (f) | 7.8% | 19.3% |
| Frederick G. Smith † | 4,000,000 | 15.6% | 4,060,199  (g) | 5.0% | 11.9% |
| Christopher S. Ripley † | — | — | 600,458  (h) | * | * |
| David B. Amy † | — | — | 221,520 | * | * |
| Lucy A. Rutishauser  † | — | — | 26,877 | * | * |
| Martin R. Leader † | — | — | 58,570 | * | * |
| Daniel C Keith † | — | — | 55,250 | * | * |
| Lawrence E. McCanna † | — | — | 24,800 | * | * |
| Barry M. Faber † | — | — | 23,172 | * | * |
| Howard E. Friedman † | — | — | 8,990 | * | * |
| The Bank of New York Mellon Corporation | | | | | |
| 225 Liberty Street | | | | | |
| New York, NY 10286 | — | — | 6,924,964  (i) | 9.1% | 2.1% |
| The Vanguard Group, Inc. | | | | | |
| 100 Vanguard Boulevard | | | | | |
| Malvern, PA 19355 | — | — | 6,580,548  (j) | 8.6% | 2.0% |
| HG Vora Capital Management, LLC | | | | | |
| 330 Madison Avenue | | | | | |
| New York, NY 10017 | — | — | 6,300,000  (k) | 8.2% | 1.9% |
| FMR LLC | | | | | |
| 245 Summer Street | | | | | |
| Boston, MA 02210 | — | — | 5,867,929  (l) | 7.7% | 1.7% |
| BlackRock, Inc. | | | | | |
| 40 East 52nd Street | | | | | |
| New York, NY 10022 | — | — | 4,613,284  (m) | 6.0% | 1.4% |
| Three Bays Capital LP | | | | | |
| 222 Berkeley Street | | | | | |
| Boston, MA 02116 | — | — | 4,117,518  (n) | 5.4% | 1.2% |
| All directors and executive officers as a group | | | | | |
| (16 persons) | 24,759,344 | 96.4% | 29,878,619  (o) | 28.7% | 75.1% |

\* Less than 1%

† The address for such beneficial owner is 10706 Beaver Dam Road, Hunt Valley, Maryland 21030.

4

(a) By virtue of a stockholders' agreement by and among David D. Smith, Dr. Frederick G. Smith, J. Duncan Smith and Robert E. Smith, each of the Smith brothers is required to vote all of his Class A and Class B Common Stock in favor of the other Smith brothers to cause their election as directors. Consequently, each of the Smith brothers may be deemed to beneficially own the shares of common stock individually owned by the other Smith brothers. Nevertheless, each of the Smith brothers disclaims beneficial ownership of the shares owned by the other Smith brothers.

(b) Percent of Class A Common Stock beneficially owned is the number of shares of Class A Common Stock beneficially owned divided by the sum of (i) number of shares of Class A Common Stock outstanding plus (ii) any Class B Common Stock individually held plus (iii) any options and stock-settled stock appreciation rights (SARs). The percentage of beneficial ownership assumes Class B Common Stock individually held plus any options and SARs are outstanding for the respective party, but not any other party.

(c) Holders of Class A Common Stock are entitled to one vote per share and holders of Class B Common Stock are entitled to ten votes per share except for votes relating to "going private" and certain other transactions. The Class A Common Stock and the Class B Common Stock vote together as a single class except as otherwise may be required by Maryland law on all matters presented for a vote. Holders of Class B Common Stock may at any time convert their shares into the same number of shares of Class A Common Stock. This column sets forth the voting power each reporting person has on the matters on which shares of Class B Common Stock have ten votes per share, and the voting power the reporting persons as a group have on such matters.

(d) Includes 7,211,072 shares of Class B Common Stock beneficially owned, each of which is convertible into one share of Class A Common Stock, 119,592 shares of Class A Common Stock issued upon the exercise of 200,000 SARs on March 22, 2017, and 10,847 shares of Class A Common Stock held in the 401(k) Plan. Also includes 366,560 shares of Class A Common Stock held in custodial accounts and irrevocable trusts established by David D. Smith for the benefit of family members, of which he is a custodian or co-trustee, 161,353 shares in a limited liability company controlled by David D. Smith, 354,000 held in trust for the David Smith Family Foundation, and shares of Class A Common Stock related to 2,835,000 outstanding SARs with exercise prices ranging from $11.68 to $35.70. The number of shares of Class A Common Stock that would be issued upon exercise of the SARs is determined by dividing the amount from the difference between the aggregate market value of the shares underlying the SARs and the aggregate exercise price of the SARs by the market share price on the date of exercise. There would have been 753,390 shares of Class A Common Stock issued, assuming that all of the outstanding SARs were exercised on March 31, 2018 based on the closing value of Class A Common Stock on April 2, 2018, the first trading day after March 31, 2018, of $30.00 and the underlying exercise prices of the SARs. The shares of Class B Common Stock include 1,000,000 shares, held in irrevocable trusts established by David D. Smith for the benefit of family members. David D. Smith also holds 59,172 unvested restricted shares at March 31, 2018.

(e) Includes 7,073,466 shares of Class B Common Stock beneficially owned, each of which is convertible into one share of Class A Common Stock, 185 shares of Class A Common Stock, and 9,987 shares in the 401(k) Plan. The shares of Class A Common Stock include 22,580 shares, held in custodial accounts established by J. Duncan Smith for the benefit of family members, of which he is the custodian. The shares of Class B Common Stock include 637,154 shares, held in irrevocable trusts established by J. Duncan Smith for the benefit of family members, of which he is a co-trustee.

(f) Includes 6,474,806 shares of Class B Common Stock beneficially owned, each of which is convertible into one share of Class A Common Stock, 12,000 shares of Class A Common Stock, 4,000 shares of Class A Common Stock in a jointly held account with immediate family members, and 654 shares of Class A Common Stock held in the 401(k) Plan. The shares of Class B Common Stock include 145,000 shares held in an irrevocable trust established by Robert E. Smith for the benefit of family members, of which he is the trustee.

(g) Includes 4,000,000 shares of Class B Common Stock beneficially owned, each of which is convertible into one share of Class A Common Stock, 50,153 shares of Class A Common Stock, and 10,046 shares of Class A Common Stock in the 401(k) Plan.

(h) Includes 375,000 outstanding stock options with exercise prices ranging from $27.36 to $33.85, 458 shares of Class A Common Stock held in the 401(k) Plan, and shares of Class A Common Stock related to 225,000 outstanding SARs with an exercise price of $33.80. The number of shares of Class A Common Stock that would be issued upon exercise of the SARs is determined by dividing the amount from the difference between the aggregate market value of the shares underlying the SARs and the aggregate exercise price of the SARs by the market share price on the date of exercise. There would have been no shares of Class A Common Stock issued, assuming that all of the

outstanding SARs were exercised on March 31, 2018 based on the closing value of Class A Common Stock on April 2, 2018, the first trading day after March 31, 2018, of $30.00 and the underlying exercise prices of the SARs. See *Compensation Discussion and Analysis, Employment Agreements* , for more information. Christopher S. Ripley also holds 59,172 unvested restricted shares at March 31, 2018.

(i)  As set forth in the Schedule 13G/A filed by The Bank of New York Mellon Corporation with the SEC on February 12, 2018, The Bank of New York Mellon Corporation is deemed to be the beneficial owner of 6,924,964 shares and has sole voting power with respect to 5,615,793 of those shares, shared dispositive power with respect to 605,906 of those shares, and sole dispositive power with respect to 6,310,442 of those shares.

(j)  As set forth in the Schedule 13G/A filed by The Vanguard Group, Inc. with the SEC on February 12, 2018, The Vanguard Group, Inc. is deemed to be the beneficial owner of 6,580,548 shares and has sole voting power with respect to 141,548 of those shares, shared dispositive power with respect to 143,640 of those shares and sole dispositive power with respect to 6,436,908 of those shares.

(k)  As set forth in the Schedule 13G filed by HG Vora Capital Management, LLC with the SEC on February 14, 2018, HG Vora Capital Management, LLC is deemed to be the beneficial owner of 6,300,000 shares and has sole voting power and dispositive power with respect to all 6,300,000 of those shares.

(l)  As set forth in the Schedule 13G/A filed by FMR, LLC with the SEC on February 13, 2018, FMR, LLC is deemed to be the beneficial owner of 5,867,929 shares and has sole voting power with respect to 67,245 of those shares and sole dispositive power with respect to all 5,867,929 of those shares.

(m)  As set forth in the Schedule 13G/A filed by BlackRock, Inc. with the SEC on January 23, 2018, BlackRock, Inc. is deemed to be the beneficial owner of 4,613,284 shares and has sole voting power with respect to 4,448,543 of those shares and sole dispositive power with respect to all 4,613,284 of those shares.

(n)  As set forth in the Schedule 13G filed by Three Bays Capital LP with the SEC on January 11, 2018, Three Bays Capital LP is deemed to be the beneficial owner of 4,117,518 shares and has sole voting power and sole dispositive power with respect to all 4,117,518 of those shares.

(o)  Includes shares of Class A Common Stock that may be acquired upon the exercise of options and SARs.

## DIRECTORS, EXECUTIVE OFFICERS AND KEY EMPLOYEES

Set forth below is certain information relating to our named directors and nominees, executive officers and certain key employees as of March 31, 2018

| Name | Age | Title |
|------|-----|-------|
| *Directors* | | |
| David D. Smith | 67 | Executive Chairman, Chairman of the Board and Director |
| Frederick G. Smith | 68 | Vice President and Director |
| J. Duncan Smith | 64 | Vice President, Secretary and Director |
| Robert E. Smith | 54 | Director |
| Howard E. Friedman | 52 | Director |
| Daniel C. Keith | 63 | Director |
| Martin R. Leader | 77 | Director |
| Lawrence E. McCanna | 74 | Director |
| *Executive Officers and Key Employees* | | |
| David B. Amy | 65 | Vice Chairman |
| Christopher S. Ripley | 41 | President, Chief Executive Officer |
| Lucy A. Rutishauser | 53 | Senior Vice President / Chief Financial Officer |
| Barry M. Faber | 56 | Executive Vice President / General Counsel / Distribution and Network Relations |
| Steven M. Marks | 61 | Executive Vice President / Chief Operating Officer |
| Steven J. Pruett | 63 | Executive Vice President / Chief TV Development Officer |
| David R. Bochenek | 55 | Senior Vice President / Chief Accounting Officer / Corporate Controller |
| Rebecca J. Hanson | 53 | Senior Vice President / Strategy and Policy |
| Delbert R. Parks, III | 65 | Senior Vice President / Chief Technology Officer |
| Donald H. Thompson | 51 | Senior Vice President / Human Resources |
| Robert D. Weisbord | 55 | Senior Vice President / Chief Revenue Officer |
| I. Scott Livingston | 53 | Senior Vice President / News |
| Justin L. Bray | 38 | Vice President / Treasurer |

Members of the Board of Directors are elected for one-year terms and serve until their successors are duly elected and qualified. Executive officers are appointed by the Board of Directors annually to serve for one-year terms and serve until their successors are duly appointed and qualified.

Messrs. David D. Smith, J. Duncan Smith and Robert E. Smith and Dr. Frederick G. Smith are brothers and have entered into a stockholders' agreement pursuant to which they have agreed to vote for each other as candidates for election to the Board of Directors until December 31, 2025.

*Profiles*

*David D. Smith* has served as Executive Chairman since January 2017 and Chairman of the Board since September 1990. Until January 2017, Mr. Smith served as President and Chief Executive Officer since 1988. Mr. Smith founded Comark Communications, Inc., a company engaged in the manufacture of high power transmitters for UHF television stations, and was an officer and director of Comark until 1986. He also was a principal in other television stations prior to serving as a General Manager of WPMY (formerly WCWB-TV) from 1984 until 1986. In 1986, Mr. Smith was instrumental in the formation of Sinclair Broadcast Group, Inc. Mr. Smith serves as a member of the Board of Directors of Atlantic Automotive Corporation, The Triscari Group, Inc., The Sinclair Relief Fund, The American Flag Foundation, Inc., Cunningham Communications Inc., and Keyser Investment Group, Inc., partner of Gertell Development, LP, and was a member of the Board of Managers of Alarm Funding Associates, LLC until it was sold in March 2017.

Based on Mr. Smith's (i) more than thirty years of experience and expertise in the television broadcast industry, (ii) extensive industry knowledge and innovative thinking, (iii) understanding of the challenges, opportunities and risks faced by us and the industry, and (iv) valuable, significant shareholder perspective, the Board believes Mr. Smith has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. Smith should continue to serve as a director for the Company.

*Frederick G. Smith* has served as Vice President of Sinclair since 1990 and Director since 1986. Prior to joining Sinclair in 1990, Dr. Smith was an oral and maxillofacial surgeon engaged in private practice and was employed by Frederick G. Smith, M.S., D.D.S., P.A., a professional corporation of which Dr. Smith was the sole officer, director and stockholder. Dr. Smith serves as a member of the Board of Directors or Trustees of the Freven Foundation, Gerstell Academy, University of Maryland at Baltimore Foundation, St. Joseph's Hospital, The Sinclair Relief Fund, Cunningham Communications Inc., and Keyser Investment Group, Inc., as well as partner of Gerstell Development, LP, and Beaver Dam, LLC.

Based on Dr. Smith's (i) more than twenty-five years of experience in the television broadcast industry, and (ii) valuable, significant shareholder perspective, the Board believes Dr. Smith has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Dr. Smith should continue to serve as a director for the Company.

*J. Duncan Smith* has served as Vice President, Secretary and as a Director of Sinclair since 1986. Prior to that, he built and operated the following television stations: WPMY (formerly WCWB-TV) in Pittsburgh, Pennsylvania; WTTE-TV in Columbus, Ohio; WIIB-TV in Bloomington, Indiana and WTTA-TV in Tampa / St. Petersburg, Florida. In addition, Mr. Smith worked for Comark Communications, Inc., a company engaged in the manufacture of high power transmitters for UHF television stations. Mr. Smith serves as a member of the Board of Directors of The High Rock Foundation, Cunningham Communications Inc., Keyser Investment Group, Inc., The Sinclair Relief Fund and The Boys' Latin School of Maryland, as well as partner of Gerstell Development, LP and Beaver Dam, LLC.

Based on Mr. Smith's (i) more than twenty-five years of experience in the television broadcast industry, and (ii) valuable, significant shareholder perspective, the Board believes Mr. Smith has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. Smith should continue to serve as a director for the Company.

*Robert E. Smith* has served as a Director since 1986. He served as Vice President and Treasurer of Sinclair from 1988 to June 1998, at which time he resigned from his position as Vice President and Treasurer. In March 1997, Mr. Smith started RSMK LLC, a commercial real estate investment company. Prior to 1986, he assisted in the construction of several television stations including WTTE-TV in Columbus, Ohio and also worked for Comark Communications, Inc., a company engaged in the manufacture of high power transmitters for UHF television stations. Mr. Smith serves as a member of the Board of Directors of Nextgen Foundation Charitable Trust, Gerstell Academy, Keyser Investment Group, Inc., Cunningham Communications, Inc., Stages Music Arts, as well as partner of Gerstell Development LP, Beaver Dam LLC, and Laker Partners, LLC.

Based on Mr. Smith's (i) more than thirty years of experience in the television broadcast industry, and (ii) valuable, significant shareholder perspective, the Board believes Mr. Smith has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. Smith should continue to serve as a director for the Company.

*Howard E. Friedman* has served as Director since January 2015. He is the founding Partner of Lanx Management LLC, a hedge "fund of funds" as well as having been the Co-Founder, Publisher & CEO of Watermark Press, Inc. From 2006-2010, Mr. Friedman served as President and then Chairman of the Board of the American Israel Public Affairs Committee (AIPAC).

8

In 2007 and in 2009, Washington Life Magazine listed Mr. Friedman as one of the 100 most powerful people in Washington D.C. From 2010-2012, he served as the President of the American Israel Educational Foundation, the charitable arm of AIPAC. He is the past Chair of the Board of The Associated: Jewish Community Federation of Baltimore. Mr. Friedman has served as President of the Baltimore Jewish Council, and as President of JTA-The Global News Service of the Jewish People. He currently serves as the Chairman of the Board of the Union of Orthodox Jewish Congregations of America. In addition, Mr. Friedman serves on the boards of the Johns Hopkins University Bloomberg School of Public Health, Touro College and University System, Talmudical Academy and the Simon Wiesenthal Center.

Based on Mr. Friedman's extensive skills in finance, management and investment matters, the Board believes Mr. Friedman has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. Friedman should continue to serve as a director for the Company.

*Daniel C. Keith* has served as a Director since May 2001. Mr. Keith is the President and Founder of the Cavanaugh Group, Inc., a Baltimore-based investment advisory firm founded in October 1995. Prior to establishing the Cavanaugh Group, Inc., Mr. Keith was Vice President, Senior Portfolio Manager, and Director of the Investment Management division of a local financial services company since 1985. During this time, he served as Chairman of the Investment Advisory Committee and was a member of the Board of Directors. Mr. Keith has been advising clients since 1979. He serves as a member of the Boards of Trustees of The High Rock Foundation.

Based on Mr. Keith's extensive skills in finance, management and investment matters, the Board believes Mr. Keith has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. Keith should continue to serve as a director for the Company.

*Martin R. Leader* has served as a Director since May 2002. Mr. Leader is a retired partner of the law firm ShawPittman (now known as Pillsbury Winthrop Shaw Pittman LLP) in Washington, D.C. where he specialized in communications law matters. Prior to his service at ShawPittman, Mr. Leader was a senior partner with the law firm of Fisher Wayland Cooper Leader & Zaragoza in Washington, D.C. from 1973 to 1999. Mr. Leader was a member of the Board of Directors of Atlantic Automotive Corporation until February 2006. Mr. Leader has served on the staff of the Office of Opinions and Review of the Federal Communications Commission. He is a member of the District of Columbia Bar. Mr. Leader graduated from Tufts University and Vanderbilt University Law School.

Based on Mr. Leader's (i) prior experience in communications law and (ii) insight on government relations particularly with the Federal Communications Commission, the Board believes Mr. Leader has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. Leader should continue to serve as a director for the Company.

*Lawrence E. McCanna* has served as a Director since July 1995. Mr. McCanna was a shareholder of the accounting firm of Gross, Mendelsohn & Associates, P.A. from 1972 and served as its managing director through June 30, 2009. On July 1, 2009, Mr. McCanna retired from full-time employment with the firm, liquidating his entire interest in Gross, Mendelson & Associates on that date. Mr. McCanna provides substantial value to the Board of Directors through his extensive accounting, finance and management experience. He is an audit committee financial expert as defined by the SEC. Mr. McCanna has served on various committees of the Maryland Association of Certified Public Accountants and was Chairman of the Management of the Accounting Practice Committee. He is also a former member of the Management of an Accounting Practice Committee of the American Institute of Certified Public Accountants and a former member of the Board of Directors of Maryland Special Olympics and Mount St. Joseph High School.

Based on Mr. McCanna's (i) extensive accounting, finance and management experience and (ii) ability to serve as an audit committee financial expert as defined by the SEC, the Board believes Mr. McCanna has acquired the experience, qualifications, attributes and skills necessary to act in the best interests of the Company and its stockholders, and thus, the Board has concluded that Mr. McCanna should continue to serve as a director for the Company.

*David B. Amy* has served as Vice Chairman since January 2017. From April 2014 to January 2017, he served as Executive Vice President and Chief Operating Officer of Sinclair Broadcast Group, Inc. Prior to that, he served as Executive Vice President / Chief Financial Officer (CFO) of Sinclair since March 2001. From September 1999 to March 2001 he served as Executive Vice President and as Vice President and CFO from September 1998 to September 1999. Beginning in 1994, he served as CFO until September 1998. In addition, he serves as Secretary of Sinclair Television Group, Inc., a wholly-owned subsidiary that owns and operates our broadcasting operations. Mr. Amy has over 30 years of broadcast experience, having joined Sinclair as a Business Manager for WPMY (formerly WPTT-TV) in Pittsburgh, Pennsylvania. Mr. Amy received his MBA degree from the University of Pittsburgh in 1981. Mr. Amy serves as a member of the Board of Managers of KDSM

Licensee, LLC, is Chairman of the Board for The Maryland Science Center, Secretary of the Board of the Television Music License Committee, and is a Board Member of CyberSpa. He is also a member of the Board of Managers of Triangle Sign & Service, LLC. He served as a member of the Board of Directors of Acrodyne Communications, Inc., and G1440 Holdings, Inc. until 2009; Visionair, Inc. until 2008 and Jadoo Power Systems, Inc. until 2007. Mr. Amy also served as the Audit Committee Chairman of Acrodyne Communications, Inc. until 2009 and Chairman of the Board of Managers of Alarm Funding Associates, LLC until it was sold in March 2017.

*Christopher S. Ripley* has served as President & Chief Executive Officer since January 2017. From April 2014 to January 2017, he served as Chief Financial Officer. Prior to Sinclair, Mr. Ripley was a managing director at UBS Investment Bank's Global Media Group and served as head of the Los Angeles office where he managed, advised and structured various financings and merger and acquisition transactions in the broadcast and entertainment sectors. Prior to UBS, Mr. Ripley was a principal in Prime Ventures and an analyst at Donaldson Lufkin & Jenrette. Mr. Ripley graduated from the University of Western Ontario, Richard Ivey School of Business, with a Bachelor of Arts in Honors Business Administration. Mr. Ripley serves as an Investor Director of hibu.

*Lucy A. Rutishauser* has served as Senior Vice President / Chief Financial Officer since March 2018. From January 2017 to March 2018, she served as Senior Vice President / Chief Financial Officer / Treasurer. From December 2013 to January 2017, she served as Senior Vice President / Corporate Finance / Treasurer. Prior to that, was Vice President / Corporate Finance / Treasurer since November 2002. From March 2001 until November 2002, she served as Treasurer and, from 1998 until March 2001, she served as Assistant Treasurer. From 1996 to 1997, Ms. Rutishauser was the Assistant Treasurer for Treasure Chest Advertising Company. From 1992 to 1996, Ms. Rutishauser served as Assistant Treasurer and Director of Treasury for Integrated Health Services, Inc. From 1988 to 1992, Ms. Rutishauser held various treasury positions with Laura Ashley, Inc. and the Black and Decker Corporation. Ms. Rutishauser graduated magna cum laude from Towson University with a Bachelor of Science degree in Economics and Finance and received her M.B.A., with honors from the University of Baltimore. Ms. Rutishauser is a member of the National Institute of Investor Relations and the Association of Finance Professionals. Ms. Rutishauser is a member of the MdBio Foundation Board of Directors.

*Barry M. Faber* has served as Executive Vice President / General Counsel, Distribution and Network Relations since January 2017, as Executive Vice President / General Counsel from May 2008 to January 2017, as Vice President / General Counsel from August 1999 to May 2008, and as Associate General Counsel from 1996 to 1999. Prior to that time, he was associated with the law firm of Fried, Frank, Harris, Shriver, & Jacobson in Washington, D.C. Mr. Faber is a graduate of the University of Virginia and the University of Virginia School of Law. Mr. Faber is also a member of the Board of Directors of The Sinclair Relief Fund.

*Steven M. Marks* has served as Executive Vice President & Chief Operating Officer since January 2017. From May 2007 to January 2017 he served as Vice President / Co-Chief Operating Officer within our broadcast segment. Prior to that, he served as Chief Operating Officer / Television Group from February 2003 to May 2007 and as Vice President / Regional Director from March 2002 to February 2003. As a Vice President / Regional Director, Mr. Marks was responsible for the Baltimore, Columbus, Pittsburgh, Flint, Tallahassee, Charleston, West Virginia, Portland, Springfield, Minneapolis, Tampa, Syracuse, Norfolk, Richmond, Buffalo and Rochester markets. Prior to his appointment as Vice President / Regional Director, Mr. Marks served as Regional Director since October 1994. Mr. Marks served as General Manager for Sinclair's flagship station, WBFF-TV in Baltimore, Maryland from July 1991 until October 1994. From 1986 until joining WBFF-TV in 1991, Mr. Marks served as General Sales Manager at WTTE-TV in Columbus, Ohio. Prior to that time, he was National Sales Manager for WFLX-TV in West Palm Beach, Florida.

*Steven J. Pruett* has served as Executive Vice President & Chief TV Development Officer since January 2017. He joined Sinclair as Vice President / Co-Chief Operating Officer within our broadcast segment in April 2013, overseeing the operations of a certain number of our television stations. Prior to that, he was with Communications Corporation of America, first as Chief Financial Officer, then becoming its President in 2006 and President and Chief Executive Officer, as well as a member of the Board, in 2007. Mr. Pruett served as special strategic advisor to DirecTV and Thomson Consumer Electronics from 1998 to 2002. From 1995 to 1999, he was a Managing Director at Communications Equity Associates. During his career, he has helped found several broadcast groups as an initial investor, financier, managing partner or board member including Spanish Radio Group Excel Communications, ACME Television, USBG, and UPI Media, where he served as President. Mr. Pruett attended Southern Illinois University at Edwardsville where he majored in Radio and Television. He later earned a Masters in Management from the JL Kellogg Graduate School of Business at Northwestern University. Beginning 2008, Mr. Pruett was a key member of the Fox Affiliate Board of Governors where he served as Treasurer until 2011 when he was elected Chairman, a position he held until 2014.

*David R. Bochenek* has served as Senior Vice President / Chief Accounting Officer / Corporate Controller since March 2018. Prior to that, he served as Senior Vice President / Chief Accounting Officer from December 2013 to February 2018. He served as Vice President / Chief Accounting Officer from May 2005 to December 2013 and Chief Accounting Officer from November 2002 to April 2005. Mr. Bochenek joined Sinclair in March 2000 as the Corporate Controller. Prior to joining Sinclair, Mr. Bochenek was Vice President, Corporate Controller for Prime Retail, Inc. from 1993 until 2000. From 1990 to 1993, Mr. Bochenek served as Assistant Vice President for MNC Financial, Inc. and prior to that held various positions in the audit department of Ernst & Young, LLP. Mr. Bochenek received his Bachelor of Business Administration in Accounting and Master of Science in Finance from Loyola University, Maryland. Mr. Bochenek is a Certified Public Accountant and is a member of the board for Media Financial Management Association (MFM).

*Rebecca J. Hanson* has served as Senior Vice President / Strategy and Policy since January 2014. Prior to that, she was a Senior Advisor, Broadcast Spectrum with the Media Bureau of the Federal Communications Commission, and served on the Incentive Auction Task Force as the point person for broadcaster participation and issues affecting nonparticipating broadcasters. Prior to joining the FCC from 2007 to 2009, she was the Vice President, Strategic Initiatives at Sprint Nextel, where she was responsible for the launch and long-term growth strategy for the WiMAX network and a member of the deal team leading the financing and merger with Clearwire for a national spectrum footprint. From 2006 to 2007 she was a consultant focusing on business planning and deal execution for various digital media companies. Prior to that and from 2000, she held the positions of Senior Vice President, Business Development, and Vice President and Deputy General Counsel at XM Satellite Radio, Inc., where she was the lead negotiator for key strategic alliances and partnerships in the areas of programming, marketing, distribution, acquisitions/joint ventures and product development. She began her career as an attorney with Brownstein and Zeidman from 1993 to 1996 and then ShawPittman (now Pillsbury Winthrop Shaw Pittman) from 1996 to 2000, where she specialized in the areas of technology, commercial finance, and venture capital.

*Delbert R. Parks, III* has served as Senior Vice President / Chief Technology Officer of Sinclair Television Group, Inc. since November 2014. Prior to that, he served as Senior Vice President / Operations and Engineering from December 2013 to November 2014 and as Vice President / Engineering and Operations from 1996 to December 2013. From 1985 to 1996, he was Director of Operations and Engineering for WBFF-TV in Baltimore, Maryland and Sinclair. He has held various operations and engineering positions with us for the last 46 years. He is responsible for planning, organizing and implementing operational and engineering policies and strategies as they relate to television operations, internet activity, information management systems, and infrastructure. Mr. Parks is a SMPTE (Society of Motion Picture and Television Engineers) Fellow and is a member of the Society of Broadcast Engineers. He is on the Board of Directors of the Baltimore Area Council of the Boy Scouts of America. Mr. Parks is also a retired Army Lieutenant Colonel who has held various commands during his 26-year reserve career.

*Donald H. Thompson* has served as Senior Vice President / Human Resources since December 2013. Prior to that, he served as Vice President / Human Resources from November 1999 to December 2013 and Director of Human Resources from September 1996 to November 1999. Prior to joining Sinclair, Mr. Thompson was a Human Resources Manager for NASA at the Goddard Space Flight Center near Washington, D.C. Mr. Thompson holds a Bachelor's Degree in Psychology and a Certificate in Personnel and Industrial Relations from University of Maryland, and an MS in Business / Human Resource & Behavioral Management and an MBA from Johns Hopkins University. Mr. Thompson is a member of the Society for Human Resource Management.

*Robert D. Weisbord* has served as Senior Vice President / Chief Revenue Officer, responsible for developing, executing and leading sales and revenue growth strategies and initiatives for Broadcasting, Digital, Advanced Revenue and all Networks sales, since December 2017. Mr. Weisbord also oversees Sinclair's Digital Group. Previously, he served as Chief Operating Officer of Sinclair Digital Group since January 2014 to December 2017. He served as Vice President / New Media from June 2010 to January 2014. From 2008 to June 2010, he served as Director of Digital Interactive Marketing for Sinclair. From 1997 to 2008, he served in various management positions for the Company including Regional Group Manager, General Manager for the Company's Las Vegas duopoly of KVMY-TV and KVCW-TV, and Director of Sales. Prior to that and from 1993, he was National Sales Manager for WTVT-TV in Tampa, Florida. Mr. Weisbord began his broadcasting career in the radio industry with Family Group Broadcasting in 1985. Mr. Weisbord holds a Bachelor of Science degree in Business Management and a Masters in Business Administration from the University of Tampa.

*I. Scott Livingston* has served as Senior Vice President of News since February 2018. Mr. Livingston oversees 73 news-producing stations, Full Measure with Sharyl Attkisson, Circa digital news, town halls and Connect to Congress. He served as Vice President of News from February 2012 to February 2018. He served as Assistant News Director at WBFF-TV (FOX 45) in Baltimore from 1997 to 2002 and as News Director from 2002 until February 2012. Mr. Livingston joined Sinclair as Chief Photographer at FOX 45 from 1991 to 1997.

*Justin L. Bray* has served as Vice President / Treasurer since March 2018. Prior to that, he served as Vice President / Corporate Controller from 2014 to March 2018. He served as Corporate Controller from September 2011 to 2014. Prior to joining Sinclair, he held various positions, most recently as Senior Manager from 2008 to 2011 within the audit department of PricewaterhouseCoopers LLP. Mr. Bray received his Bachelor of Business Administration degree in Accounting and Master of Business Administration degree from Loyola University Maryland. He is a Certified Public Accountant and is a member of the American Institute of Certified Public Accountants and the Maryland Association of Certified Public Accountants.

## CORPORATE GOVERNANCE

*Board of Directors and Committees.* In 2017 , the Board of Directors held a total of nine meetings. All directors attended at least 78% of the meetings of the Board of Directors and all committees of the Board of Directors on which they served. All directors, with the exception of Messrs. McCanna and Friedman, attended the Annual Meeting held on June 1, 2017 . It is the Board's policy that the directors should attend our annual meeting of shareholders, absent exceptional cause.

The committees of the Board of Directors include an Audit Committee and a Compensation Committee and from time to time special committees formed by the Board of Directors as may be necessary.

*Board Leadership Structure and Risk Oversight .* David D. Smith served as both the Chairman of the Board of Directors and Executive Chairman during 2017 . Mr. Smith's performance is reviewed annually by the Compensation Committee, which reports results to the Board of Directors. The Compensation Committee consists of four directors, all of whom are independent pursuant to the Nasdaq Stock Market rules (the Nasdaq listing requirements). The Board of Directors appoints an independent director to preside over special committee meetings; however, no lead independent director of the Board of Directors exists. The Company deems this leadership structure appropriate for our Controlled Company (see Controlled Company Determination below) as it promotes efficient communication between management and the Board of Directors as well as between the various board committees and the Board of Directors while monitoring effective independent board oversight over the Executive Chairman, Chief Executive Officer and the Company's risks. While the Company's management is charged with managing the Company's day-to-day risks, the Company's financial risk oversight is primarily conducted by the Audit Committee, which consists entirely of independent directors for purposes of Nasdaq listing requirements and Rule 10A-3 under the Securities Exchange Act of 1934, as amended (the Exchange Act). The Audit Committee reports financial risk oversight matters to the Board of Directors based on committee assessments and periodic reports from management. The Compensation Committee provides risk oversight concerning our compensation policies and practices. The Board of Directors with the assistance of management is responsible for all other risk oversight measures.

*Risk Assessment of Compensation Policies and Practices.* One of the Company's primary sources of revenue is advertising which it sells to a large variety of customers. The Company does not pay a significant amount of incentive compensation to employees with the ability to take significant risks which could have a material adverse effect on the Company. Incentive compensation is primarily paid to sales personnel who are not executive officers of the Company and do not have the ability or authority to engage in significant risk taking activity. While we pay incentive compensation to certain of our executive officers, it is not significant to the Company as a whole and we believe it is designed to minimize unnecessary risk taking by aligning each executive's interests with those of our shareholders and by emphasizing long-term performance rather than promoting short-term risk taking at the expense of long-term returns. Our sales personnel and executive officers are incentivized to generate revenues and cannot participate in material speculative transactions or put material amounts of capital at risk without Board approval. As a result, the Company's management, in consultation with the Company's Compensation Committee, determined that the Company's compensation policies and practices are not reasonably likely to have a material adverse effect on the Company.

*Controlled Company Determination.* Our Board has determined that we are a "Controlled Company" for purposes of the Nasdaq listing requirements. A "Controlled Company" is a company of which more than 50% of the voting power is held by an individual, a group or another company. Certain Nasdaq listing requirements do not apply to a "Controlled Company," including requirements that: (1) a majority of its board of directors must be comprised of "independent" directors as defined in the Nasdaq listing requirements; and (2) the compensation of officers and the nomination of directors be determined in accordance with specific rules, generally requiring determinations by committees comprised solely of independent directors or in meetings at which only the independent directors are present. Our Board of Directors has determined that we are a "Controlled Company" based on the fact that the Smith brothers hold more than 50% of our voting power and are parties to a stockholders' agreement that obligates them to vote for each other as candidates for election to the Board of Directors. The Smith brothers have been our executive officers and/or directors at all times since we became a publicly traded company in 1995. Currently, David D. Smith, Frederick G. Smith and J. Duncan Smith are executive officers and directors and Robert E. Smith is a director.

*Director Independence.* The Board has determined that Messrs. McCanna, Keith, Leader, and Friedman have no relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that they otherwise meet the independence criteria under the Nasdaq listing requirements. The Board has also determined that Messrs. McCanna, Keith and Leader satisfy the additional independence requirements of Rule 10A-3 under the Exchange Act, enabling them to serve on the Audit Committee. In making its independence determination, the Board of Directors considered any transactions, relationships and arrangements as required by our independence guidelines. In particular, with respect to each of the most recent completed three fiscal years, the Board evaluated Mr. Keith, the type and amount of investment advisory services provided by the firm where he serves as an executive officer to our Controlling Shareholders and family members of our Controlling Shareholders.

*Audit Committee* The members of the Audit Committee are Messrs. McCanna, Keith and Leader. The Audit Committee is governed by a written charter approved by the Board of Directors and available on our website at www.sbgi.net. The Audit Committee formally met five times during the year ended December 31, 2017 .

The Board of Directors has determined that all audit committee members are financially literate under the Nasdaq listing requirements and that Lawrence E. McCanna qualifies as an "audit committee financial expert" as defined by the SEC rules adopted pursuant to the Exchange Act.

The Nasdaq listing requirements require that audit committees have at least three directors and that all directors be independent, as defined in the Nasdaq listing requirements and Rule 10A-3 under the Exchange Act. The Board has determined that Messrs. McCanna, Keith and Leader meet the independence criteria established in the Nasdaq listing requirements and the Exchange Act.

The Audit Committee assists the Board of Directors in its oversight of financial reporting practices and the quality and integrity of the financial reports of Sinclair including compliance with legal and regulatory requirements, the independent auditors' qualifications and independence and the performance of Sinclair's internal control function. The Audit Committee is responsible for the appointment of Sinclair's independent auditors, whose appointment may be ratified by the shareholders. The Audit Committee oversees all of our internal controls and risk management policies and meets with our independent auditor and management regarding our internal controls and other matters. The Audit Committee is responsible for reviewing compliance with Sinclair's ethics policy and has established procedures for the receipt, retention and treatment of complaints received by Sinclair regarding accounting controls or auditing matters and the confidential, anonymous submission by Sinclair's employees of concerns regarding questionable accounting or auditing matters. The Audit Committee is also responsible for approving or ratifying related person transactions pursuant to Sinclair's related person transaction policy. This policy is described in this proxy statement under the caption *Related Person Transactions* .

*Compensation Committee* Nasdaq listing requirements require that compensation of executive officers be determined, or recommended to the Board of Directors for determination, either by a majority of the independent directors or a compensation committee comprised solely of independent directors. As a "Controlled Company," we are not subject to this listing requirement. However, the Compensation Committee during 2017 and as of today consists entirely of Messrs. Keith, Friedman, McCanna, and Leader, all of whom meet the independence criteria established by the Nasdaq listing requirements. These independent directors also meet the criteria to be outside directors under Section 162(m) of the Internal Revenue Code of 1986 ("Section 162(m)") and are responsible for compensation intended to qualify as "performance-based compensation" exempt from the $1 million deduction limit under Section 162(m). Although the Compensation Committee does not have a written charter, the Compensation Committee is charged with the responsibility for setting executive compensation, reviewing certain compensation programs, administering our equity incentive plans, recommending for inclusion in this proxy statement the Compensation Discussion and Analysis which is included in this proxy statement, preparing the compensation committee report required by SEC rules which is included in this proxy statement, and making other recommendations to the Board of Directors. The Compensation Committee formally met nine times during the year ended December 31, 2017 .

Each year, the Compensation Committee reviews the prior performance of each named executive officer, reviews the effectiveness of past compensation objectives and approves the compensation policies and plans for the next fiscal year. The Compensation Committee assesses named executive officer's operational abilities, leadership skills, and potential to contribute to long-term shareholder value. The Compensation Committee provides risk oversight concerning our compensation policies and practices for executive officers. Executive officers have access to the Compensation Committee to present and discuss their own performance and compensation plan. At times, the Compensation Committee may specifically request meetings with executive officers to gain a full understanding and exploration of assessed attributes. Our Executive Chairman, David D. Smith, and our CEO, Christopher S. Ripley, consult with the Compensation Committee on appropriate compensation for executive officers. In addition, our Senior Vice President, Human Resources, Donald H. Thompson, presents information and recommendations to the Compensation Committee based on market evaluations. The Compensation Committee does not use outside consultants to set compensation.

*Director Nominations*  The Board does not have a standing nominating committee and there is no formal nominating committee charter, although the Board has adopted a resolution addressing the director nominations process. Instead, the directors who are determined to be "independent" under the Nasdaq listing requirements perform the functions of a nominating committee. The Board believes it is appropriate not to maintain a standing nominating committee primarily because the relatively small number of independent directors on the Board makes it unnecessary to separate the nominating function into a committee structure.

Our independent directors are primarily responsible for identifying and recommending nominees to the Board of Directors for approval of membership on the Board. The independent directors' primary responsibilities in recommending nominees are to: (1) establish criteria for the selection of new directors to become members of the Board, which criteria shall be approved by the Board; (2) lead the search for and identify individuals qualified to become members of the Board and conduct the necessary and appropriate inquiries into the backgrounds and qualifications of possible nominees; (3) consider questions of independence and possible conflicts of interest of members of the Board and executive officers, and whether a candidate has special interests or a specific agenda that would impair his or her ability to effectively represent the interest of all shareholders; (4) consider recommendations for director nominees from current directors and executive officers, shareholders and other parties they deem appropriate; (5) have the authority to retain and terminate a search firm to identify director candidates at our expense; (6) determine each proposed nominee's qualifications for service on the Board; (7) consult with the Executive Chairman and Chairman of the Board during the process of identifying director nominees; and (8) identify and recommend annually, or as vacancies or newly created positions occur, director nominees for approval by the Board of Directors. Further, while the Board has no formal diversity policy, the independent directors regularly review the composition and size of the Board in order to ensure that the Board is comprised of members reflecting the proper expertise, skills, attributes, diverse perspectives and personal and professional backgrounds for service as one of our directors.

The independent directors will consider nominees proposed by shareholders. Although there is no formal policy regarding shareholder nominees, the Board of Directors believes that shareholder nominees should be viewed in substantially the same manner as other nominees. The consideration of any candidate for director will be based on an assessment of the individual's background, skills and abilities, and if such characteristics qualify the individual to fulfill the needs of the Board at that time. To recommend a prospective nominee for consideration, shareholders should submit the candidate's name, contact information, biographical material and qualifications in writing to Corporate Secretary, Sinclair Broadcast Group, Inc., 10706 Beaver Dam Road, Hunt Valley, Maryland 21030. For more information regarding nominating a director, see *Shareholder Proposals*

*Interested Party Communication with the Board.* Shareholders and other parties interested in communicating directly with the Board, any Board committee or any Director, may do so by writing to Sinclair Board of Directors, c/o Corporate Secretary, Sinclair Broadcast Group, Inc., 10706 Beaver Dam Road, Hunt Valley, Maryland 21030. Under the process adopted by the Board, letters we receive that are addressed to members of the Board are reviewed by our Corporate Secretary who will regularly forward a summary and copies of all such correspondence to the Board.

Concerns relating to accounting, internal controls or auditing matters are immediately brought to the attention of the Chairman of the Audit Committee and handled in accordance with procedures established by the Audit Committee with respect to such matters. Shareholder communications that constitute advertising or promotion of a product or service or relate to improper or irrelevant topics will not be forwarded to the Board, any board committee or any director.

*Compensation Committee Interlocks and Insider Participation.* The members of the Compensation Committee are Messrs. Keith, Friedman, Leader and McCanna. None of the members of our Compensation Committee at any time has been one of our officers or employees.

The following executive officers are directors of other entities that have a director or executive officer who is on our Board of Directors. David D. Smith, Frederick G. Smith and J. Duncan Smith, all of whom are executive officers and on our Board of Directors, are directors and/or executive officers of other various companies controlled by them, including Cunningham Communications, Inc., Keyser Investment Group, Inc., Gerstell Development, LP and Sinclair Relief Fund. Frederick G. Smith and J. Duncan Smith also control Beaver Dam, LLC along with Robert E. Smith. Barry M. Faber is an executive officer of Sinclair and a director of The Sinclair Relief Fund. David B. Amy is an executive officer of Sinclair and a member of the Board of Managers of Triangle. See *Related Person Transactions* for additional information regarding the previously mentioned executive officers and directors.

During 2017 , none of the named executive officers participated in any final deliberations of our Compensation Committee relating to compensation of the named executive officers.

14

## DIRECTOR COMPENSATION FOR 2017

The following table sets forth certain information regarding compensation for services rendered by our non-employee directors during the year ended December 31, 2017

| Name (a) | Fees Earned or Paid in Cash | Stock Awards (b) | All Other Compensation | | Total |
|---|---|---|---|---|---|
| Robert E. Smith | $ 51,000 | $ 131,540 | $ — | (c) | $ 182,540 |
| Howard E. Friedman | 64,500 | 131,540 | — | | 196,040 |
| Daniel C. Keith | 85,000 | 131,540 | — | | 216,540 |
| Martin R. Leader | 79,000 | 131,540 | — | | 210,540 |
| Lawrence E. McCanna | 84,500 | 131,540 | — | | 216,040 |

(a) Compensation for David D. Smith, our Chairman of the Board and Executive Chairman, is reported in the Summary Compensation Table included in this proxy statement. Frederick G. Smith and J. Duncan Smith are omitted from this table, as they serve as executive officers, but are not named executive officers and do not receive additional compensation for services provided as directors.

(b) On the date of our annual meeting, each non-employee director received a grant of 4,000 shares of Class A Common Stock pursuant to the 1996 Long-Term Incentive Plan for services rendered during the preceding year. The amount presented represents the grant date fair value of the stock award computed in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 718.

(c) Robert E. Smith is a participant in our company sponsored health care plan. Mr. Smith pays standard premiums pursuant to the plan; however, unlike a typical company participant, he is required to reimburse the Company for any health care costs in excess of $100,000. During 2017, Mr. Smith's health care costs did not exceed $100,000, nor did they exceed the premiums he paid; therefore, we did not have to pay for any costs during the year.

Non-employee directors receive $35,000 for their services as a director. The Audit Committee Chairman receives an additional $7,500 annually and the Compensation Committee Chairman receives an additional $6,000 annually. Non-employee directors also receive $2,000 for each Board of Directors meeting attended, $2,500 for each audit committee meeting and special committee meeting, if any, attended and $1,500 for each compensation committee meeting attended. We reimburse our directors for any business-related travel expenses. Additionally, each non-employee director is granted unrestricted shares of Class A Common Stock upon election to the board on the date of our annual meeting of shareholders.

## COMPENSATION DISCUSSION AND ANALYSIS

*Introduction.* In this section, we discuss certain aspects of our compensation program as it pertains to our Executive Chairman, Vice Chairman, President and CEO, Senior Vice President / Chief Financial Officer (CFO), and Executive Vice President / General Counsel in 2017 . These individuals represent our principal executive officer, our principal financial officer and our next three most highly compensated executive officers during 2017 . We refer to these five persons throughout this proxy statement as the "named executive officers." Our discussion focuses on compensation and practices relating to our most recently completed fiscal year.

We believe that the performance of each of the named executive officers has the potential to impact both our short-term and long-term profitability. Our Board of Directors has established a Compensation Committee that is responsible for establishing and administering our named executive officers' and other key employees' compensation. The Compensation Committee consists of four non-employee directors, all of whom are independent under the Nasdaq listing requirements.

*General Philosophy, Objectives and Design*   We believe that our people are our most valuable resource and that the dedication and quality of our named executive officers are vital to the long-term interests of our shareholders. We have established a compensation program for our executive officers that is competitive and designed to support our strategic goals. The primary objectives of our compensation program are to attract and retain the best available people while efficiently utilizing available resources, to enhance the executive officers' overall performance, to align the long-term interests of our executive officers with those of our shareholders, to improve our overall business performance and to reward individual performance. This is accomplished through a combination of base salary, long-term incentive compensation and cash bonus designed to be competitive with comparable employers in the television broadcast industry. The Compensation Committee considers both the Company's overall performance and the individual's performance when setting compensation levels. However, there are no set guidelines or policies outlining the weight of each, as the Compensation Committee assesses each factor at its discretion.

*Shareholder Say on Pay Considerations.* We provide our stockholders with the opportunity to cast an advisory vote ever three years to approved our executive compensation (also known as "Say on Pay"). In 2017, approximately 96% of our shareholders that voted approved our executive compensation. Our Board and our Compensation Committee considered the strong voting results as a shareholder endorsement of our executive compensation policies and practices, and we intend to continue to emphasize our pay-for-performance compensation philosophy that aligns long-term interests of our executives with those of our shareholders.

*Compensation Process .* Each year, the Compensation Committee reviews the prior performance of each executive officer, reviews the effectiveness of past compensation objectives and approves the compensation policies and plans for the next fiscal year. The Compensation Committee assesses each executive officer's operational abilities, leadership skills, and potential to contribute to long-term shareholder value. Executive officers have access to the Compensation Committee to present and discuss their own performance and compensation plan. At times, the Compensation Committee may specifically request meetings with executive officers to gain a full understanding and exploration of assessed attributes. Messrs. Smith and Ripley consult with the Compensation Committee on appropriate compensation for executive officers other than themselves. In addition, our Senior Vice President, Human Resources, Donald H. Thompson, presents information and recommendations to the Compensation Committee based on market evaluations. In determining the amount of executive officer compensation each year, the Compensation Committee reviews competitive market data from the broadcast and media industry as well as other similarly sized companies comparable to us, including those companies we have determined to be in our peer group. The Compensation Committee does not benchmark executive officer compensation against competitive market data or our peer group. However, when determining the levels of base salary, cash bonuses and equity awards of our executive officers, o ur Compensation Committee uses market data in combination with an analysis of other factors including company and individual performance and executive officer responsibilities.

For 2017 , the Compensation Committee determined that our peer group consisted of the following companies in our industry:

- Gray Television, Inc.

- Cumulus Media, Inc.

- Nexstar Media Group, Inc.

- iHeartMedia Inc.

- Pandora Media, Inc.

- Meredith Corporation

- Tegna, Inc.

- Tribune Media

- MDC Partners Inc.

- Scholastic Corporation

- E.W. Scripps

- Scripps Network Interactive

- IAC/Interactive Corp

- The New York Times Company

- Clear Channel Outdoor Holdings Inc.

In addition, the Compensation Committee considers information from salary surveys to evaluate compensation for similar positions taking into account geographic location and the companies' revenue size. These surveys included Salary.com / CompAnalyst / Kenexa, Towers Watson and Mercer reports. While we review these surveys, we do not formally engage outside compensation consultants.

All final compensation decisions regarding executive officers are made by the Compensation Committee, which is comprised of independent directors.

· *Primary Elements of Compensation.* We provide a competitive mix of compensation elements that align executive officer compensation with shareholder value. Our compensation program includes both short and long-term compensation in the form of base salary, long-term incentive compensation and cash bonus as discussed below. We believe that these compensation components provide an appropriate mix of fixed and variable pay, balance short-term operational performance with long-term shareholder value and encourage executive recruitment and retention, which aligns with our compensation philosophy and objectives.

*Base Salary.* Base salaries are not objectively determined, but instead reflect levels that we concluded were appropriate based upon our general experience. Base salary is designed to provide competitive levels of compensation to our executive officers based upon their experience, professional status, accomplishments, duties and scope of responsibility. As noted above under *Compensation Process,* also taken into consideration when establishing base salaries are salaries paid by our competitors for similar positions within the television broadcast industry, as well as salaries paid by companies outside of our industry for comparable positions. In addition to market comparisons, the Compensation Committee considers individual performance when determining base salary.

*Long-Term Incentive Compensation.* Our compensation program includes long-term incentive compensation, paid in the form of restricted stock awards, stock-settled appreciation rights (SARs), stock options, and other long-term incentive cash bonuses including a Special Longevity Bonus payable to certain executive officers pursuant to their respective employment agreements (see *Employment Agreements* below). We have elected to pay long-term incentive compensation in order to provide an incentive for our executive officers to provide strong returns to our shareholders, to better align the interests of our executive officers with those of our shareholders, to continue long-term leadership in the service of the Company and to ensure a competitive compensation program given the market prevalence of equity compensation.

Our restricted Class A Common Stock awards are granted pursuant to the Company's 1996 Long-Term Incentive Plan (the LTIP) and are time-based awards requiring the executive officer to remain employed by the Company in order for the restricted stock to vest, which is generally over two years.

SARs granted pursuant to the LTIP, have a 10-year term and are fully vested upon grant. Upon exercise of SARs, the holder would receive a number of shares of Class A Common Stock, equal in value to the difference between the SARs' base value and the per share closing price of the Company's Class A Common Stock on the date of exercise for the number of SARs being exercised.

Stock options granted pursuant to the LTIP, have a 10-year term and have exercise prices equal to the fair value of the Class A Common Stock on the date of grant, and may or may not have certain vesting conditions.

When granting equity awards, consideration is given to company and employee performance, but awards are made at the discretion of the Compensation Committee under no objective guidelines. Grants of equity awards are valued only at the closing price of our stock on the date of grant. We try to make grants of equity awards at times when they will not be influenced by scheduled releases of information or while we otherwise do not possess material, non-public information, but we have no formal policy as to the timing of equity grants.

Certain executive officers are entitled to a Special Longevity Bonus, as defined in their respective employment agreements, providing for a single lump sum cash payment due to the executive officer at a specified future date. These Special Longevity Bonuses are time-based awards requiring the executive officer to remain employed by the Company for the term of the award.

*Cash Bonus* . Our compensation philosophy is to primarily award cash bonuses to those that have a direct influence on our ongoing revenue and television operating performance. Based on this criteria, in early 2017 , the Compensation Committee determined that Mr. Ripley, our President and Chief Executive Officer; Mr. Smith, who oversees the development, implementation, and globalization of ATSC 3.0, expansion of our news franchise, and public policy as

17

it relates to the broadcast industry; and Mr. Faber, who oversees distribution and network partner relationships, would each be eligible to receive a performance-based cash bonus for 2017 performance. The purpose of Messrs. Ripley, Smith and Faber's cash bonus is to promote the attainment of specific financial goals and reward achievement of those goals. We favor an objective approach when measuring the cash bonus. The Compensation Committee determines at its discretion the maximum bonus amounts paid.

For 2017 , Mr. Ripley's and Mr. Smith's cash bonus consisted of two components, a semi-annual cash bonus and an annual cash bonus. Messrs. Ripley and Smith were eligible for maximum semi-annual bonus amounts of $625,000 per semi-annual period and for a maximum annual bonus of $625,000, dependent on the generation of certain earnings before interest, taxes, depreciation and amortization (EBITDA) targets. EBITDA is a non-GAAP measure reflective of the operating performance of the entire company. EBITDA is calculated as GAAP operating income plus research and development expenses, stock-based compensation, depreciation and amortization, impairments, other non-cash charges less non-cash revenue and cash film payments. We believe this measure best captures Mr. Ripley's and Mr. Smith's ability to drive the performance of the Company. Semi-annual bonuses were earned pro rata from zero starting at 92% to 100%. Messrs. Ripley and Smith were eligible to receive the maximum amount of the available semi-annual bonus payments for the year when 100% of the annual targeted EBITDA was met even though on a six month basis the semi-annual targeted EBITDA was not met. Annual bonuses were earned pro rata from zero starting at 100% to 108%. For 2017 , Messrs. Ripley and Smith's targeted EBITDA for the first half, second half, and full year of 2017 was $399.4 million, $448.7 million, and $848.1 million, respectively. During the first half of 2017 , 93.8% of the budgeted YTD EBITDA of $399.4 million was achieved and Messrs. Ripley and Smith were each paid $140,625.

In the event that certain events take place that were not contemplated at the time the targets were determined, the Compensation Committee can adjust the targets to exclude the effect of these events. Examples of such events include acquisitions, dispositions and changes in accounting rules. In addition, we target the amount of EBITDA used in individual bonus determinations at amounts commensurate with the executive's sphere of influence.

Additionally, Mr. Ripley received a discretionary bonus of $400,000 for his performance during 2017 as determined by the Compensation Committee.

For 2017 , Mr. Faber's cash bonus consisted of a maximum annual bonus of $350,000, dependent on reaching 50 million Tennis channel paying subscribers at the end of the year or reaching an average of at least 50 million subscribers for the 12-month period. For 2017 , Mr. Faber was paid his maximum $350,000 bonus and a $100,000 discretionary bonus, as determined by the Compensation Committee.

For 2017, Ms. Rutishauser's and Mr. Amy's cash bonus consisted of a $200,000 and $10,000 discretionary bonus, respectively, as determined by the Compensation Committee.

*Formula Plan.* In 2017, our Board of Directors adopted the Executive Performance Formula and Incentive Plan (Formula Plan), which provides an award pool, equal to not more than 10% of the Company's EBITDA for the plan period, in which awards consisting of cash, shares, equity awards, or a combination thereof are awarded to designated key executives by the Compensation Committee.

Participants in the Formula Plan are awarded a percentage of the award pool at the beginning of the plan period, with no one participant being awarded more than 50% of the award pool for any given plan period. The Compensation Committee may, at its discretion, reduce, but not increase, the maximum award for any participant and the size of the award pool.

All shares used to pay equity awards are granted under, and made subject to the terms of, the LTIP or any other Company equity compensation plan. For purposes of determining the number of shares subject to such equity awards, the Compensation Committee will value awards in the form of restricted stock, restricted stock units or other full-value share awards at the fair market value of the shares underlying the grant on the date of the equity award and will value awards in the form of options and stock appreciation rights at their fair value on the date of the equity award, as expensed by the Company under applicable accounting rules for purposes of the Company's financial statements.

During 2017, no awards were made under the Formula Plan.

*Retirement Plans.* Our compensation program includes retirement plans designed to provide income following a named executive officer's retirement. Our executive officers can participate in The Sinclair Broadcast Group, Inc. 401(k) Profit Sharing Plan and Trust (the 401(k) Plan). Contributions made to the 401(k) Plan are matched by the Company, typically in the form of our Class A Common Stock. The match is discretionary and is typically equal to

50% of elective deferrals, up to 4% of each executive officer's total cash compensation subject to Internal Revenue Service regulations. Beginning in 2018, the match is calculated as 100% on the first 3% of compensation contributed plus 50% on the next 2% of compensation contributed. In addition, the Compensation Committee has the ability to make additional discretionary contributions to the 401(k) Plan for the benefit of all employees including executive officers. Calculations of targeted overall compensation for executive officers do not include the benefits expected to be received under the 401(k) Plan. Executive officers participate in the 401(k) Plan on the same terms as all other employees.

*Deferred Compensation Plan.* Effective January 1, 2014, we established a nonqualified executive benefit plan (the Deferred Compensation Plan) provided to a select group of highly compensated employees as determined by the Company. The plan is a voluntary program that allows participants to defer eligible compensation for a minimum of five years up to normal retirement age, and make investment elections for the deferred compensation. Employees may defer up to 80% of their compensation and/or 100% of certain bonuses. Participants may receive an employer discretionary match on their deferral, or other discretionary employer contributions. Elective deferrals are 100% vested upon contribution. Any employer discretionary contributions vest in increments of 25% each year of service, and are fully vested after four years of service, with all prior service credited towards vesting, or upon disability, death, or attainment of age 65.

*Perquisites and Other Benefits*. Perquisites and other benefits represent a minimal amount of the executive officers' compensation. The Compensation Committee annually reviews the perquisites that executive officers receive. The primary perquisites for executive officers are tickets to sporting events and certain business entertainment events and related expenses.

Executive officers also participate in our other benefit plans on the same terms as all other employees. These other plans include medical, dental and vision insurance, disability and life insurance and the employee stock purchase plan.

*Employment Agreements*. We do not have an employment agreement with David D. Smith. Below is a description of the employment agreements we have entered into with our other named executive officers:

In September 1998, we entered into an employment agreement with David B. Amy, which was amended and restated in November 2011. The agreement does not have any specified termination date and we have the right to terminate the employment of Mr. Amy at any time, with or without cause. Payment due upon termination, in addition to any earned but unpaid normal compensation and benefits as of the termination date, in the event of death or disability is equal to the current base salary through the end of the month in which termination occurs. In the event of termination without cause or for good reason, Mr. Amy will also receive one additional month of base salary. Mr. Amy received a base salary for 2017 of $904,000. The agreement also contains non-competition and confidentiality restrictions on Mr. Amy.

In March 2014, we entered into an employment agreement with Christopher S. Ripley, which was amended and restated in August 2017. The agreement does not have any specified termination date and we have the right to terminate the employment of Mr. Ripley at any time, with or without cause. Mr. Ripley joined the Company effective April 1, 2014. Mr. Ripley received a base salary for 2017 of $1,250,000. Under the agreement, Mr. Ripley has the right to earn an annual performance bonus, which may include a cash portion thereof up to 150% of his base salary for the year in which such performance bonus is paid, at the discretion of the Company's Compensation Committee (the "Performance Bonus"). Mr. Ripley's employment agreement provides that in the event his employment is terminated by the Company without cause or by Mr. Ripley for good reason, Mr. Ripley will be entitled to a payment equal to the sum of (i) his annual base salary, (ii) the average of any cash portions of Performance Bonuses paid to him for the two calendar years immediately preceding the effective date of the termination, and (iii) the sum of any incentive compensation, including cash bonus, common stock grants, common stock option grants, and SARs grants, made to him for the year immediately preceding the effective date of the termination. The severance payment due upon death or disability is equal to the current base salary through the end of the year in which termination occurs and one month of base salary for each full year of continuous employment, in addition to any earned but unpaid vacation time as of the termination date. The agreement also contains non-competition and confidentiality restrictions on Mr. Ripley.

In August 2004, we entered into an employment agreement with Barry M. Faber which was most recently amended in March 2017. The agreement does not have any specified termination date and we have the right to terminate the employment of Mr. Faber at any time, with or without cause. Mr. Faber received a base salary for 2017 of $950,000. Payment due upon termination, in addition to any earned but unpaid normal compensation and benefits as of the termination date, in the event of death or disability is equal to the current base salary through the end of the month in which termination occurs. In the event of termination without cause or for good reason, Mr. Faber will also receive

19

twelve additional months of base salary plus any unpaid bonus (other than a discretionary bonus or the Longevity Bonus). The agreement also contains non-competition and confidentiality restrictions on Mr. Faber.

In March 2001, we entered into an employment agreement with Lucy A. Rutishauser, which was amended and restated in August 2017. The agreement does not have any specified termination date and we have the right to terminate the employment of Ms. Rutishauser at any time, with or without cause. Ms. Rutishauser received a base salary for 2017 of $800,000. Effective August 2017, Ms. Rutishauser is entitled to a Special Longevity Bonus, as defined in the agreement, providing for a single lump sum cash payment of $2,500,000 due at the earlier of December 8, 2023 or upon a change-in-control or a termination of employment by the Company without cause or by the employee with good reason. Additionally, upon termination of employment as a result of death or disability, a percentage of the Special Longevity Bonus will be paid, determined by the total cumulative days of service divided by total days of service that would have been provided through December 8, 2023. Payment due upon termination, in addition to the Special Longevity Bonus discussed above and any earned but unpaid normal compensation and benefits as of the termination date, in the event of death or disability, termination without cause, or termination by employee for good reason, is equal to the current base salary through the end of the month in which termination occurs and one month of base salary for each full year of continuous employment. The agreement also contains non-competition and confidentiality restrictions on Ms. Rutishauser.

*Accounting and Tax Consideration.* In designing our compensatory programs, we take into account the various tax and accounting rules associated with the various forms of compensation. In addition, Section 162(m) of the Code (Section 162(m)) places a limit of $1 million per year on the amount of compensation paid to certain of our executive officers that the Company may deduct from our federal income tax return for any single taxable year. There is an exception to the $1 million limitation for performance-based compensation meeting certain requirements, although this exception is severely limited beginning in 2018, as described below. The material terms of the LTIP were previously approved by shareholders in 2013 for purposes of Section 162(m), which allowed us to grant certain long-term incentive awards that are designed to meet the definition of performance-based compensation under Section 162(m) in order to qualify for the performance-based exception to the $1 million deduction limit. However, to maintain flexibility in compensating executive officers in a manner designed to promote varying corporate goals in the best interest of the Company, the Compensation Committee did not previously limit executive compensation to amounts deductible under Section 162(m) if the Compensation Committee determined that doing so is in the best interests of the Company.

The Tax Cuts and Jobs Act, enacted on December 22, 2017, substantially modifies Section 162(m) and, among other things, eliminates the performance-based exception to the $1 million deduction limit effective as of January 1, 2018. As a result, beginning in 2018, compensation paid to certain executive officers in excess of $1 million will generally be non-deductible, whether or not it is performance-based. In addition, beginning in 2018, the executive officers subject to Section 162(m) (the "Covered Employees") will include any individual who served as the chief executive officer (the CEO) or chief financial officer (the CFO) at any time during the taxable year and the three other most highly compensated officers (other than the CEO and CFO) for the taxable year, and once an individual becomes a Covered Employee for any taxable year beginning after December 31, 2016, that individual will remain a Covered Employee for all future years, including following any termination of employment.

The Tax Cuts and Jobs Act includes a transition rule under which the changes to Section 162(m) described above will not apply to compensation payable pursuant to a written binding contract that was in effect on November 2, 2017 and is not materially modified after that date. To the extent applicable to our existing contracts and awards, the Compensation Committee may avail itself of this transition rule. However, because of uncertainties as to the application and interpretation of the transition rule, no assurances can be given at this time that our existing contracts and awards, even if in place on November 2, 2017, will meet the requirements of the transition rule. Moreover, to maintain flexibility in compensating executive officers in a manner designed to promote varying corporate goals in the best interest of the company, the Compensation Committee does not limit its actions with respect to executive compensation to preserve deductibility under Section 162(m) if the Compensation Committee determines that doing so is in the best interests of the Company.

*Executive Compensation Actions After December 31, 2017* . For 2018 , compensation was set by the Compensation Committee as follows:

| Name | Base Salary | Maximum Annual Bonus Potential (a) |
|------|------------|------------------------------------|
| David D. Smith | $ 1,275,000 | $ 1,912,500 (b) |
| Christopher S. Ripley | 1,275,000 | 1,912,500 (b) |
| Lucy A. Rutishauser | 1,000,000 | 200,000 (c) |
| David B. Amy | 922,080 | — |
| Barry M. Faber | 969,000 | — |

(a) Excludes bonuses that may be awarded at the discretion of the Compensation Committee, the amounts of which were not previously defined or agreed upon. Messrs. Ripley, Amy, and Faber and Ms. Rutishauser were awarded $400,000, $10,000, $100,000, and $200,000 discretionary bonuses, respectively, for their services during 2017.

(b) Mr. Smith's and Mr. Ripley's Maximum Annual Bonus Potential will be categorized in two components: a semi-annual bonus and an annual bonus. The semi-annual bonus will be earned pro rata from zero starting at 92% to 100%. However, when 100% of the annual targeted EBITDA is met, even though on a semi-annual basis the quarterly targeted EBITDA was not met, they will be eligible to receive a maximum amount of available semi-annual bonus payments for the year. The annual bonus will be earned pro rata from zero starting at 100% to 108%.

(c) Ms. Rutishauser's Maximum Annual Bonus Potential will be categorized in one component: a quarterly bonus. The quarterly bonus will be earned pro rata from zero starting at 92% to 100%. However, when 100% of the annual targeted EBITDA is met, even though on a quarterly basis the quarterly targeted EBITDA was not met, she will be eligible to receive a maximum amount of available quarterly bonus payments for the year.

In February 2018, the Compensation Committee also granted restricted stock awards to named executive officers in accordance with the discussion under "Long-Term Incentive Compensation" above. Messrs. Smith, Ripley, Amy, and Faber, and Ms. Rutishauser were granted restricted stock awards of 59,172, 59,172, 15,953, 16,765, and 5,882 shares, respectively. Additionally, the Compensation Committee granted both Mr. Smith and Mr. Ripley SARs awards of 225,000.

21

## Compensation Committee Report

*The information contained in this report shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934, each as amended, except to the extent that the Company incorporated it by specific reference.*

The Compensation Committee of the Board of Directors has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and based on such review and discussions, the Compensation Committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in or incorporated by reference into the Company's annual report on Form 10-K and the Company's proxy statement on Schedule 14A.

Compensation Committee

Daniel C. Keith, Chairman
Howard E. Friedman
Martin R. Leader
Lawrence E. McCanna

22

## Summary Compensation Table for 2017 , 2016 and 2015

The following table sets forth certain information regarding compensation for services rendered in all capacities during the year ended December 31, 2017 by the named executive officers.

| Name and Principal Position | Year | Salary | Stock Awards (a) | Bonus (b) | Option Awards (c) | Non-equity Incentive Plan Compensation (d) | Change in Value of Nonqualified Deferred Compensation Earnings (e) | All Other Compensation (f) | Total |
|---|---|---|---|---|---|---|---|---|---|
| David D. Smith, | 2017 $ | 1,250,000 $ | — $ | — | $ 5,242,344 $ | 140,625 $ | — $ | 5,400 $ | 6,638,369 |
| Executive Chairman | 2016 | 1,001,139 | — | — | 4,000,000 | 200,000 | — | 5,300 | 5,206,439 |
| | 2015 | 1,000,000 | — | — | 2,600,000 | 1,000,000 | — | — | 4,600,000 |
| Christopher S. Ripley, | 2017 | 1,250,000 | — | 400,000 | — | 140,625 | 801 | 44,906 | 1,836,332 |
| President and | 2016 | 782,225 | — | 600,000 | 489,021 | — | 12 | 32,986 | 1,904,244 |
| Chief Executive Officer | 2015 | 766,875 | — | 675,000 | 843,663 | — | — | — | 2,285,538 |
| David B Amy, | 2017 | 904,000 | 540,800 | 10,000 | — | — | 153,372 | 26,983 | 1,635,155 |
| Vice Chairman | 2016 | 886,000 | 476,495 | — | — | — | 63,261 | 31,276 | 1,457,032 |
| | 2015 | 869,000 | 498,600 | — | — | — | — | 37,424 | 1,405,024 |
| Lucy A. Rutishauser, | 2017 | 800,000 | 111,540 | 200,000 | — | — | 17,294 | 24,639 | 1,153,473 |
| Senior Vice President / | 2016 | 425,000 | 94,200 | — | — | — | 6,586 | 18,638 | 544,424 |
| Chief Financial Officer | 2015 | 376,500 | 109,692 | — | — | — | — | 16,098 | 502,290 |
| Barry M. Faber, | 2017 | 950,000 | 642,200 | 100,000 | — | 350,000 | 203,104 | 24,448 | 2,269,752 |
| Executive Vice President / | 2016 | 900,000 | 502,400 | 3,001,000 (g) | — | — | 7,760 | 83,810 | 4,494,970 |
| General Counsel | 2015 | 837,425 | 498,600 | — | — | — | — | 38,706 | 1,374,731 |

(a) Represents the grant date fair value, computed in accordance with FASB ASC Topic 718, of restricted stock awards granted in 2017 , 2016 and 2015 . For further information regarding assumptions made in the valuation of stock awards, see *Note 3. Stock-Based Compensation Plans* to our consolidated financial statements and related footnotes in our 2017 Annual Report on Form 10-K, as well as, the *Grants of Plan-Based Awards* table below. Dividends are paid on all stock awarded after the issuance of such award at the same rate and time as paid to other stockholders as declared by our Board from time to time.

(b) Represents discretionary bonuses earned and approved by the Compensation Committee.

(c) Represents the grant date fair value, computed in accordance with FASB ASC Topic 718, of SARs granted in 2017 , 2016 and 2015 and stock options granted in 2016 and 2015 . For further information regarding assumptions made in the valuation of stock awards, see *Note 3. Stock-Based Compensation Plan* to our consolidated financial statements and related footnotes in our 2017 Annual Report on Form 10-K, as well as, the *Grants of Plan-Based Awards* table below.

(d) Messrs. Smith, Ripley, and Faber's cash bonuses are dependent on their performance pursuant to the cash bonus calculation as well as market evaluations. See *Compensation Discussion and Analysis* above for further information.

(e) Represents all earnings (not only above-market earnings) related to the employee's participation in the Company's deferred compensation plan. See *Deferred Compensation Plan* within *Compensation Discussion and Analysis* above for further description of the plan.

23

(f) All Other Compensation consists of Company contributions to both the Deferred Compensation Plan and the 401(k) Plan. See *Compensation Discussion and Analysis, Employment Agreements*, for more information, and also includes perquisites composed entirely of travel expenses paid by the Company on the behalf of friends and family who accompanied named executive officers during business related travel.

All Other Compensation for the year ended December 31, 2017 is as follows:

| Name | Company Contributions to the 401(k) Plan | | Company Contributions to the Deferred Compensation Plan | | Perquisites and Other Personal Benefits | | Total |
|---|---|---|---|---|---|---|---|
| Mr. Smith | $ | 5,400 | $ | — | $ | — | $ | 5,400 |
| Mr. Ripley | | 5,400 | | 39,506 | | — | | 44,906 |
| Mr. Amy | | 5,400 | | 18,188 | | 3,395 | | 26,983 |
| Ms. Rutishauser | | 5,400 | | 15,844 | | 3,395 | | 24,639 |
| Mr. Faber | | 5,400 | | 19,048 | | — | | 24,448 |

(g) Represents payment of the Special Longevity Bonus due in accordance with the employment agreement to Mr. Faber. See *Compensation Discussion and Analysis, Employment Agreements*, for more information.

## Grants of Plan-Based Awards for 2017

The following table provides certain information about grants of plan-based awards to the named executive officers during the year ended December 31, 2017

| Name | Grant Date | Estimated Possible Payouts Under Non-Equity Incentive Plan Awards (a) | | | All Other Option Awards: Number of Securities Underlying Options | All Other Stock Awards: Number of Shares of Stock | Exercise or Base Price of Option Awards | Grant Date Fair Value of Stock and Option Awards (b) | |
|---|---|---|---|---|---|---|---|---|---|
| | | Threshold | Target | Maximum | | | | | |
| David D. Smith | 2/14/2017 | $ 625,000 | $ 1,250,000 | $ 1,875,000 | 500,000 | — | $ 35.70 (c) | $ 5,242,344 | |
| Christopher S. Ripley | | 625,000 | 1,250,000 | 1,875,000 | — | — | — | — | |
| David B. Amy | 2/3/2017 | — | — | — | — | 16,000 | — | 540,800 | (d) |
| Lucy A. Rutishauser | 2/3/2017 | — | — | — | — | 3,300 | — | 111,540 | (d) |
| Barry M. Faber | 2/3/2017 | 350,000 | 350,000 | 350,000 | — | 19,000 | — | 642,200 | (d) |

(a) For Messrs. Smith and Ripley, threshold reflects the minimum payment they are eligible to receive if the semi-annual actual EBITDA exceeds the targeted EBITDA. The semi-annual bonus is earned pro rata from zero starting at 92% to 100%. Target reflects the amount that Mr. Smith and Mr. Ripley are eligible to receive if the annual actual EBITDA exceeds the targeted EBITDA, even if, on a six-month basis, the semi-annual EBITDA was not met. Maximum reflects the target plus Mr. Smith and Mr. Ripley's annual bonus component earned pro rata from zero starting at 100% to 108%. For Mr. Faber, threshold, target, and maximum reflect the amount Mr. Faber is eligible to receive if Tennis Channel reaches 50 million or an average of 50 million paying subscribers at the end of the annual period or for the 12-month period, respectively. For further information regarding Messrs. Smith, Ripley, and Faber's cash bonuses, see the *Primary Elements of Compensation – Cash Bonus* section of the *Compensation Discussion and Analysis* above. During 2017 , no other named executive officers were eligible to receive non-equity incentive plan awards. For information related to actual non-equity incentive plan awards see *Summary Compensation Table for 2017 , 2016 and 2015* above.

(b) This column shows the full grant date fair value of restricted stock awards and SARs. The grant date fair values of the restricted stock and SAR awards were computed in accordance with FASB ASC Topic 718 and do not include estimates for forfeitures. There can be no assurance that the FASB ASC Topic 718 amounts shown in this table will ever be realized by the named executive officer. Dividends are paid on all stock awarded after the issuance of such award at the same rate and time as paid to other stockholders as declared by our Board from time to time. For further information regarding restricted stock and SARs awards, see the *Primary Elements of Compensation – Long-Term Incentive Compensation* section of the *Compensation Discussion and Analysis* above.

(c) Our common stock's closing price per share on February 14, 2017 (the grant date for all SARs) was $35.70. The SAR awards vested immediately.

(d) Our common stock's closing price per share on February 3, 2017 was $33.80. Restrictions on restricted stock granted in 2017 lapse over two years at 50% on the first anniversary of the grant date and 50% on the second anniversary of the grant date. Restricted stock award vesting is not dependent on future performance levels; rather it is dependent solely on future service with the Company.

## Outstanding Equity Awards at Fiscal Year End for 2017

The following table provides certain information about all equity compensation awards held by the named executive officers as of December 31, 2017 . All options and SARs held by named executive officers are exercisable.

| Name | Option Awards | | | Stock Awards | |
|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options Exercisable | Option Exercise Price | Option Expiration Date | Number of Shares or Units of Stock that have not Vested | Market Value of Shares or Units of Stock that have not Vested (a) |
| David D. Smith | 500,000 (b) $ | 35.70 | 02/14/2027 | — $ | — |
| | 400,000 (b) | 31.40 | 03/01/2026 | — | — |
| | 310,000 (b) | 24.93 | 02/02/2025 | — | — |
| | 200,000 (b) | 27.86 | 02/11/2024 | — | — |
| | 500,000 (b) | 14.21 | 02/05/2023 | — | — |
| | 400,000 (b) | 11.68 | 03/09/2022 | — | — |
| | 300,000 (b) | 12.07 | 03/22/2021 | — | — |
| Christopher S. Ripley | 125,000 (b) | 33.85 | 12/31/2026 | — | — |
| | 125,000 (b) | 32.54 | 12/31/2025 | — | — |
| | 125,000 (b) | 27.36 | 12/31/2024 | — | — |
| David B. Amy | — | — | — | 23,588 (c) | 876,294 |
| Lucy A. Rutishauser | — | — | — | 4,800 (d) | 178,320 |
| Barry M. Faber | — | — | — | 27,000 (c) | 1,003,050 |

(a) Based on the closing market price of $37.15 per share on January 2, 2018, the first day of trading after December 31, 2017.

(b) SARs and options are fully vested on the grant date.

(c) 7,588 shares will vest in March 2018 and 8,000 shares will vest in February 2018 and 2019.

(d) 1,500 shares will vest in March 2018 and 1,650 shares will vest in February 2018 and 2019.

(e) 8,000 shares will vest in March 2018 and 9,500 shares will vest in February 2018 and 2019.

26

## Option Exercises and Stock Vested

The following table provides information regarding the exercise of options, SARs, and vesting of shares of restricted stock held by the named executive officers during the year ended December 31, 2017

| Name | Option/SARs Awards | | Stock Awards | |
| | Number of Securities Underlying Options/SARs Exercised | Value Realized on Exercise (a) | Number of Shares Acquired on Vesting | Value Realized on Vesting (b) |
|---|---|---|---|---|
| David D. Smith | 200,000 $ | 4,694,000 | — $ | — |
| Christopher S. Ripley | — | — | — | — |
| David B. Amy | — | — | 17,587 | 649,533 |
| Lucy A. Rutishauser | — | — | 3,700 | 135,908 |
| Barry M. Faber | — | — | 18,000 | 666,600 |

(a) The value realized on exercise is calculated by multiplying the number of shares exercised by the appreciation per share, or the closing market price of our common stock on the exercise date less the option exercise price.

(b) Represents the total value realized upon the vesting of restricted shares using the average of the high and low prices of our common stock on the vesting dates.

27

‌

## Nonqualified Deferred Compensation

The following table provides certain information about nonqualified deferred compensation of the named executive officers during the year ended, and as of, December 31, 2017

| Name | Executive Contributions in Last Fiscal Year (a) | Registrant Contributions in Last Fiscal Year (b) | Aggregate Earnings in Last Fiscal Year (c) | Aggregate Withdrawals / Distributions | Aggregate Balance at Last Fiscal Year End |
|---|---|---|---|---|---|
| David D. Smith | $          — | $          — | $          — | $          — | $          — |
| Christopher S. Ripley | 79,011 | 39,506 | 801 | — | 202,328 |
| David B. Amy | 227,345 | 18,188 | 153,372 | — | 1,171,072 |
| Lucy A. Rutishauser | 39,609 | 15,844 | 17,294 | — | 138,921 |
| Barry M. Faber | 38,097 | 19,048 | 203,104 | — | 3,374,962 |

(a) Represents deferrals made by the participant during 2017 .

(b) Represents contributions made by the Company to the participant's account pursuant the Deferred Compensation Plan. Amount is also disclosed within footnote (f) within the *Summary Compensation Table* within *Compensation Discussion and Analysis* above.

(c) Represents all earnings related to the participant's in the Company's deferred compensation plan. Amount is also disclosed within the change in value of nonqualified deferred compensation earnings column in *Summary Compensation Table* within *Compensation Discussion and Analysis* above.

See *Deferred Compensation Plan* within *Compensation Discussion and Analysis* above for further description of the plan.

## Potential Post-Employment Payments and Benefits

The following table sets forth the potential payments if termination of employment or a change in control for each named executive officer had occurred on December 31, 2017. In addition, the named executive officers may be eligible for payment of their accounts under the Company's nonqualified deferred compensation plan in the event of a change in control.

| Benefits and Payments upon Termination | Termination without cause or by employee for good reason | | Termination with cause | | Termination by employee without good reason | | Change in Control | | Death or Disability |
|---|---|---|---|---|---|---|---|---|---|
| David D Smith | $ | — | $ | — | $ | — | $ | — | $ — |
| | | | | | | | | | |
| Christopher S. Ripley | | | | | | | | | |
| Severance Payment (a) | $ | 1,390,625 | $ | — | $ | — | $ | — | $ 312,500 |
| Deferred Compensation (b) | | — | | — | | — | | — | 21,017 |
| Total | $ | 1,390,625 | $ | — | $ | — | $ | — | $ 333,517 |
| | | | | | | | | | |
| David B. Amy | | | | | | | | | |
| Severance Payment (a) | $ | 75,333 | $ | — | $ | — | $ | — | $ — |
| Restricted Stock (c) | | 876,294 | | — | | — | | 876,294 | 876,294 |
| Total | $ | 951,627 | $ | — | $ | — | $ | 876,294 | $ 876,294 |
| | | | | | | | | | |
| Lucy A. Rutishauser | | | | | | | | | |
| Severance Payment (a) | $ | 3,766,667 | $ | — | $ | 1,266,667 | $ | 3,766,667 | $ 3,173,150 |
| Restricted Stock (c) | | 178,320 | | — | | | | 178,320 | 178,320 |
| Total | $ | 3,944,987 | $ | — | $ | 1,266,667 | $ | 3,944,987 | $ 3,351,470 |
| | | | | | | | | | |
| Barry M. Faber | | | | | | | | | |
| Severance Payment (a) | $ | 1,300,000 | $ | — | $ | — | $ | — | $ — |
| Restricted Stock (c) | | 1,003,050 | | — | | — | | 1,003,050 | 1,003,050 |
| Total | $ | 2,303,050 | $ | — | $ | — | $ | 1,003,050 | $ 1,003,050 |

(a) Represents the severance payment due based on the terms of their employment agreements. See *Compensation Discussion and Analysis, Employment Agreements*, for more information.

(b) Represents the amount of employer contributions to the employee's Deferred Compensation Plan which will become immediately vested upon termination by death or disability.

(c) Based on the closing market price of $37.15 per share on January 2, 2018, the first day of trading after December 31, 2017. Restricted stock immediately vests upon a termination by the Company without cause or by an named executive officer for good reason, a change in control, death or disability, as defined in the restricted stock agreement.

## Equity Compensation Plan Information

The equity compensation plan information as of December 31, 2017 was as follows.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities to be issued upon exercise of outstanding options, warrants and rights) (c) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,393,928 $ | 23.73 | 7,358,530 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 1,393,928 $ | 23.73 | 7,358,530 |

(a) Includes 375,000 shares of Class A Common Stock related to stock options outstanding. Also includes 1,018,928 shares of Class A Common Stock which would have been issued if 2,610,000 SARs, with exercise prices ranging from $11.68 to $35.70, were exercised on December 31, 2017 . The number of shares of Class A Common Stock issued is determined by dividing the amount from the difference between the aggregate market value of the shares underlying the SARs and the aggregate exercise price of the SARs by the market share price on the date of exercise.

(b) The weighted average exercise price is based on 375,000 outstanding stock options with exercise prices ranging from $27.36 to $33.85, and 2,610,000 SARs with exercise prices ranging from $11.68 to $35.70.

(c) This amount reflects the total shares available for future issuance under the Company's LTIP and the Company's Employee Stock Purchase Plan.

## CEO PAY RATIO FOR 2017

Item 402(u) of Regulation S-K requires us to disclose the ratio of the annual total compensation of our Chief Executive Officer (CEO), Christopher S. Ripley, to the median of the annual total compensation of all other employees.

The annual total compensation of our CEO, as disclosed in the *Summary Compensation Table* within *Compensation Discussion and Analysis* above, was $1,836,332 for the year ended December 31, 2017 . The annual total compensation of our median employee was $47,927 for the year ended December 31, 2017 Annual total compensation, for both our CEO and median employee, was calculated in accordance with Item 402(c)(2)(x) of Regulation S-K.

Based on the foregoing, our estimate of the ratio of our CEO's annual total compensation to the median of the annual total compensation of all other employees was 38:1 for the year ended December 31, 2017 .

We identified our median employee by gathering the 2017 gross pay, including salary and bonus, for all employees, excluding our CEO, employed by the Company on December 31, 2017 . We included all full-time, part-time, and seasonal employees. We made pro rata adjustments for full-time employees which were hired during the year. We believe gross pay is a reasonable, consistently-applied compensation measure by which to determine our median employee.

Given the different methodologies that various public companies will use to determine an estimate of their pay ratio, the estimated ratio reported above should not be used as a basis for comparison between companies.

## SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act, requires our officers (as defined in the SEC regulations), directors and persons who beneficially own more than ten percent of a registered class of our equity securities, to file reports of ownership and changes in ownership with the SEC. Officers, directors and greater than ten percent shareholders are required by SEC regulation to furnish us with copies of all Section 16(a) forms they file.

Based solely on a review of copies of such reports of ownership furnished to us, or written representations that no forms were necessary, we believe that during the past fiscal year our officers, directors and greater than ten percent beneficial owners complied with all applicable filing requirements with four exceptions. Howard E. Friedman did not file a Form 4 reporting the disposal of Class A Common Stock. The report on Form 4, originally due September 2, 2016, was filed with the SEC on October 3, 2017. David D. Smith did not file a Form 4 reporting the acquisition of Class A Common Stock for custodial accounts and irrevocable trusts established by David D. Smith for the benefit of family members, of which he is a custodian or co-trustee. This report on Form 4, originally due May 17, 2016, was filed with the SEC on June 13, 2017. David D. Smith did not file a Form 4 reporting the grant of stock-settle appreciation rights (SARs). This report on Form 4, originally due February 16, 2017, was filed with the SEC on February 17, 2017. David D. Smith did not file a Form 4 reporting the acquisition of Class A Common Stock for irrevocable trusts established by David D. Smith for the benefit of family members, of which he is a co-trustee, a limited liability company controlled by David D. Smith, and a trust for the David Smith Family Foundation. This report on Form 4, originally due January 20, 2016, was filed with the SEC on January 18, 2017.

## RELATED PERSON TRANSACTIONS

Our related person transaction policy covers any transaction, arrangement or relationship, or any series of similar transactions, arrangements or relationships in which the Company was or is to be a participant, wherein the amount involved exceeds $120,000 and a related person had or will have a direct or indirect material interest. The Board of Directors has determined that certain transactions falling within the characteristics above do not create a material direct or indirect interest on behalf of the related person, and are, therefore, not deemed to be related person transactions.

The Audit Committee of the Board of Directors reviews all material related person transactions and may approve or ratify the related person transaction only if the Audit Committee determines that, under all of the circumstances, the transaction is in, or is not inconsistent with, the best interests of the Company. The Audit Committee may, in its sole discretion, impose such conditions as it deems appropriate on the Company or the related person in connection with approval of the related person transaction.

Any related person transaction previously approved by the Audit Committee or otherwise already existing that is ongoing in nature shall be reviewed by the Committee annually to ensure that such related person transaction has been conducted in accordance with the previous approval granted by the Committee, if any, and that all required disclosures regarding the related person transaction are made.

Prior to the adoption of our related person transaction policy, consistent with the Nasdaq listing requirements and the Audit Committee charter, the Audit Committee reviewed or approved all related person transactions requiring disclosure under SEC regulations to the extent such transactions were entered into or amended since February 2004. Certain of the following transactions were not approved pursuant to the current related person transaction policy because they were entered into before the policy's existence.

For further information regarding related person transactions, see *Note 11. Related Person Transactions* to our consolidated financial statements in our 2017 Annual Report on Form 10-K.

### Code of Business Conduct and Ethics

We have adopted a code of business conduct and ethics that applies to all of our directors, officers and employees (including our chief executive officer, chief financial officer, chief accounting officer and corporate controller and any person performing similar functions). We have made the Code of Business Conduct and Ethics available on our website at www.sbgi.net. We will disclose promptly any waiver from or amendment to the Code of Business Conduct and Ethics for our executive officers or directors as required by law, SEC regulations or Nasdaq listing requirements, by posting such disclosure on our website.

## AUDIT COMMITTEE, AUDIT FEES AND AUDITOR INDEPENDENCE

### Report of the Audit Committee

*The information contained in this report shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any previous or future filings under the Securities Act of 1933 or the Securities Exchange Act of 1934, each as amended, except to the extent that the Company incorporated it by specific reference.*

The Audit Committee has received from Sinclair's independent registered public accounting firm, PricewaterhouseCoopers LLP (PwC), written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board, regarding PwC's independence, including communications between PwC and us regarding PwC's independence, and has discussed with PwC its independence. The Audit Committee has discussed whether the provision of non-audit services by PwC is compatible with maintaining PwC's independence. PwC has stated that it believes that it is in full compliance with all of the independence standards established under generally accepted auditing standards and the rules of the SEC. The Audit Committee concurs, and has approved all non-audit services provided by PwC in 2017 . The Audit Committee also has discussed with PwC the matters required to be discussed by the applicable standards of the Public Company Accounting Oversight Board, including the selection of and changes in Sinclair's significant accounting policies, the basis for management's accounting estimates, PwC's conclusions regarding the reasonableness of those estimates and the disclosures included in the financial statements.

The Audit Committee met with management and representatives of PwC in connection with PwC's audit of Sinclair's consolidated financial statements and related schedule for the year ended December 31, 2017 , and reviewed and discussed such financial statements with management. The Audit Committee also reviewed management's report on its assessment of the effectiveness of Sinclair's internal control over financial reporting and the independent registered public accounting firm's report on the effectiveness of Sinclair's internal control over financial reporting. Based on such review and discussion with management, and based on the Audit Committee's reviews and discussions with PwC regarding its independence and the matters required to be discussed under Public Company Accounting Oversight Board (PCAOB) Auditing Standard No. 16, Communications with Audit Committees (AS 16), the Audit Committee recommended to the Board of Directors that the audited financial statements and management's assessment of the effectiveness of Sinclair's internal control over financial reporting be included in Sinclair's Annual Report on Form 10-K and the Board has approved that recommendation.

The Audit Committee has reviewed and discussed the fees paid to PwC during the last year for audit and non-audit services, which are set forth in this proxy statement under "Disclosure of Fees Charged by Independent Registered Public Accounting Firm," and has determined that the provision of the non-audit services is compatible with PwC's independence.

Audit Committee

Lawrence E. McCanna, Chairman
Daniel C. Keith
Martin R. Leader

**Disclosure of Fees Charged by Independent Registered Public Accounting Firm**

The following summarizes the fees charged by PwC for certain services rendered to us during 2017 and 2016, respectively:

| | | Year ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2017 | | 2016 |
| Audit fees (a) | $ | 3,286,194 | $ | 2,754,638 |
| Audit-related fees (b) | | 100,000 | | — |
| Tax fees (c) | | 868,895 | | 459,958 |
| All other fees (d) | | 4,500 | | 3,600 |
| Total | $ | 4,259,589 | $ | 3,218,196 |

(a) Fees paid for annual audits of our consolidated financial statements and effectiveness of internal control over financial reporting, reviews of interim consolidated financial statements and fees related to debt offerings.

(b) Fees paid for services related to the adoption of new accounting standards.

(c) Tax fees incurred for tax planning, compliance, and due diligence services.

(d) Fees incurred related to permitted services not included in the category descriptions provided.

All of the services described above were pre-approved by the Audit Committee. None were approved pursuant to the waiver of pre-approval provisions set forth in Regulation S-X of the Exchange Act.

**Pre-Approval Policy for Services of Independent Registered Public Accounting Firm**

Audit Committee maintains a pre-approval policy that provides guidelines for the audit, audit-related, tax and other permissible non-audit services that may be provided by the independent registered public accounting firm (the independent auditors) in order to ensure that the provision of such services does not impair the auditor's independence. Under this policy, which remains in effect, the Audit Committee annually pre-approves the audit fee and terms of the engagement, as set forth in the engagement letter, along with a specified list of audit-related and tax services. If any service to be provided by the independent auditors has not received pre-approval during this annual process, it will require specific pre-approval by the Audit Committee and the independent auditors may not begin work on any engagement without confirmation of the Audit Committee pre-approval from the Chief Accounting Officer or his or her delegate. In accordance with this policy, the Chairman of the Audit Committee has been authorized by the Committee to pre-approve any audit-related, tax or other permissible non-audit service engagements of the independent auditors.

## SHAREHOLDER PROPOSALS

If you intend to propose any matter for action at our 2019 annual meeting of shareholders, you must submit your proposal to the Secretary of Sinclair at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030 not later than December 27, 2018 at 5:00 p.m. Eastern Standard Time. Only then can we consider your proposal for inclusion in our proxy statement and proxy relating to the 2019 annual meeting. The proxy for the 2019 annual meeting will grant discretionary authority to vote with regard to shareholder proposals not included in our proxy materials unless (a) notice is received by March 12, 2019 and (b) the conditions set forth in Rule 14 a-4 (c)(2)(i)-(iii) under the Securities Exchange Act of 1934 are met.

BY ORDER OF THE BOARD OF DIRECTORS

J. Duncan Smith, Secretary

Baltimore, Maryland
April 26, 2018



ANNUAL MEETING OF STOCKHOLDERS OF

# SINCLAIR BROADCAST GROUP, INC.

### June 7, 2018

**GO GREEN**

e-Consent makes it easy to go paperless. With e-Consent, you can quickly access your proxy material, statements and other eligible documents online, while reducing costs, clutter and paper waste. Enroll today via www.astfinancial.com to enjoy online access.

### NOTICE OF INTERNET AVAILABILITY OF PROXY MATERIAL:

The Notice of Meeting, proxy statement, 2017 annual report to stockholders and proxy card are available at http://www.astproxyportal.com/ast/26141/

## Please sign, date and mail your proxy card in the envelope provided as soon as possible.

↓ Please detach along perforated line and mail in the envelope provided ↓

■ 20830000000000000000 4                           06□718

THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ALL NOMINEES ON PROPOSAL 1, AND "FOR" PROPOSAL 2.
PLEASE SIGN, DATE AND RETURN PROMPTLY IN THE ENCLOSED ENVELOPE. PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE ☒

1. Election of eight directors for a term expiring in 2019 as set forth in the proxy statement

☐ FOR ALL NOMINEES
☐ WITHHOLD AUTHORITY FOR ALL NOMINEES
☐ FOR ALL EXCEPT (See instructions below)

**NOMINEES**
○ David D. Smith
○ Frederick G. Smith
○ J. Duncan Smith
○ Robert E. Smith
○ Howard E. Friedman
○ Lawrence E. McCanna
○ Daniel C. Keith
○ Martin R. Leader

2. Ratification of the appointment of PricewaterhouseCoopers LLP as the Independent Registered Public Accounting Firm for the year ending December 31, 2018.

FOR ☐  AGAINST ☐  ABSTAIN ☐

**This proxy when properly executed will be voted in the manner directed herein by the undersigned stockholder. If no direction is made, this proxy will be voted FOR all nominees for director, FOR any other proposal, and in accordance with proxies' discretion on any other business that may properly come before the meeting to the extent permitted by law.**

INSTRUCTIONS: To withhold authority to vote for any individual nominee(s), mark "FOR ALL EXCEPT" and fill in the circle next to each nominee you wish to withhold, as shown here. ●

TO INCLUDE ANY COMMENTS, USE THE COMMENTS BOX ON THE REVERSE SIDE OF THIS CARD.

To change the address on your account, please check the box at right and indicate your new address in the address space above. Please note that changes to the registered name(s) on the account may not be submitted via this method. ☐

Signature of Stockholder _____ Date: _____   Signature of Stockholder _____ Date: _____

Note:  Please sign exactly as your name or names appear on this Proxy. When shares are held jointly, each holder should sign. When signing as executor, administrator, attorney, trustee or guardian, please give full title as such. If the signer is a corporation, please sign full corporate name by duly authorized officer giving full title as such. If signer is a partnership, please sign in partnership name by authorized person.

37

1

# SINCLAIR BROADCAST GROUP, INC.

**PROXY SOLICITED BY BOARD OF DIRECTORS FOR ANNUAL MEETING ON JUNE 7, 2018
THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ALL NOMINEES ON PROPOSAL 1,
AND "FOR" PROPOSAL 2.**

The undersigned hereby authorizes and directs Massachusetts Mutual Life Insurance Company, as trustee (the "Trustee") of Sinclair Broadcast Group, Inc. 401(k) Profit Sharing Plan, to vote as proxy for the undersigned as herein stated at the Annual Meeting of Stockholders of Sinclair Broadcast Group, Inc. (the "Company") to be held on June 7, 2018 at the Company's corporate office, 10706 Beaver Dam Road, Hunt Valley, MD 21030 at 10:00 a.m. local time, and at any adjournment or postponement thereof, all shares of common stock of the Company allocated to the account of the undersigned under such Plan, on the proposals set forth on the reverse hereof and in accordance with the Trustee's discretion on any other matters that may properly come before the meeting or any adjournments or postponements thereof. The undersigned hereby acknowledges receipt of the Notice and Proxy Statement for the Annual Meeting on June 7, 2018.

**THE SHARES COVERED BY THIS PROXY WILL BE VOTED AS SPECIFIED. IF NO SPECIFICATION IS MADE, THE PROXY WILL BE VOTED BY THE TRUSTEE IN ITS SOLE DISCRETION IN THE BEST INTEREST OF THE PLAN PARTICIPANTS AND BENEFICIARIES.**

**PLEASE MARK, SIGN, DATE AND RETURN THIS VOTING INSTRUCTION CARD PROMPTLY USING THE ENCLOSED ENVELOPE.**

*(Not valid unless dated and signed on the reverse side)*

COMMENTS:

1.1

ANNUAL MEETING OF STOCKHOLDERS OF

# SINCLAIR BROADCAST GROUP, INC.

### June 7, 2018

**GO GREEN**
e-Consent makes it easy to go paperless. With e-Consent, you can quickly access your proxy material, statements and other eligible documents online, while reducing costs, clutter and paper waste. Enroll today via www.astfinancial.com to enjoy online access.

**NOTICE OF INTERNET AVAILABILITY OF PROXY MATERIAL:**
The Notice of Meeting, proxy statement, 2017 annual report to stockholders and proxy card are available at http://www.astproxyportal.com/ast/26141/

## Please sign, date and mail your proxy card in the envelope provided as soon as possible.

↓ Please detach along perforated line and mail in the envelope provided. ↓

20830000000000000000 4                                     060718

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ALL NOMINEES ON PROPOSAL 1, AND "FOR" PROPOSAL 2.**
**PLEASE SIGN, DATE AND RETURN PROMPTLY IN THE ENCLOSED ENVELOPE. PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE ☒**

1. Election of eight directors for a term expiring in 2019 as set forth in the proxy statement

☐ FOR ALL NOMINEES

☐ WITHHOLD AUTHORITY FOR ALL NOMINEES

☐ FOR ALL EXCEPT (See instructions below)

NOMINEES
○ David D. Smith
○ Frederick G. Smith
○ J. Duncan Smith
○ Robert E. Smith
○ Howard E. Friedman
○ Lawrence E. McCanna
○ Daniel C. Keith
○ Martin R. Leader

2. Ratification of the appointment of PricewaterhouseCoopers LLP as the Independent Registered Public Accounting Firm for the year ending December 31, 2018        FOR ☐   AGAINST ☐   ABSTAIN ☐

This proxy, when properly executed, will be voted in the manner directed herein by the undersigned stockholder. If no direction is made, this proxy will be voted FOR all nominees for director, FOR any other proposal, and in accordance with proxies' discretion on any other business that may properly come before the meeting to the extent permitted by law.

INSTRUCTIONS: To withhold authority to vote for any individual nominee(s), mark "FOR ALL EXCEPT" and fill in the circle next to each nominee you wish to withhold, as shown here. ●

TO INCLUDE ANY COMMENTS, USE THE COMMENTS BOX ON THE REVERSE SIDE OF THIS CARD.

To change the address on your account, please check the box at right and indicate your new address in the address space above. Please note that changes to the registered name(s) on the account may not be submitted via this method. ☐

Signature of Stockholder _____ Date: _____ Signature of Stockholder _____ Date: _____

Note: Please sign exactly as your name or names appear on this Proxy. When shares are held jointly, each holder should sign. When signing as executor, administrator, attorney, trustee or guardian, please give full title as such. If the signer is a corporation, please sign full corporate name by duly authorized officer, giving full title as such. If signer is a partnership, please sign in partnership name by authorized person.

39

1

## SINCLAIR BROADCAST GROUP, INC.

**PROXY SOLICITED BY BOARD OF DIRECTORS FOR ANNUAL MEETING ON JUNE 7, 2018**
**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" ALL NOMINEES ON PROPOSAL 1,**
**AND "FOR" PROPOSAL 2.**

The undersigned hereby appoints David D. Smith and Frederick G. Smith, or either of them, as attorneys-in-fact, with full power of substitution, to vote in the manner indicated on the reverse side, and with discretionary authority as to any other matters that may properly come before the meeting, all shares of common stock of Sinclair Broadcast Group, Inc. (the "Company") which the undersigned is entitled to vote at the Annual Meeting of Stockholders of the Company to be held on June 7, 2018 at the Company's corporate office, 10706 Beaver Dam Road, Hunt Valley, MD 21030 at 10:00 a.m. local time, and at any adjournment or postponements thereof.

**(Not valid unless dated and signed on the reverse side)**

COMMENTS:

1.1

40

# EXHIBIT B

# HACH ROSE SCHIRRIPA & CHEVERIE LLP
## ATTORNEYS AT LAW

August 24, 2018

**VIA FedEx**
Sinclair Broadcasting Group, Inc
Board of Directors
c/o General Counsel Office
10706 Beaver Dam Road
Hunt Valley, Maryland 21030

Re:   *Demand upon Sinclair Broadcasting Group, Inc. to take Suitable Action*

Dear Board of Directors of Sinclair Broadcasting Group, Inc.:

We represent Teamsters Local 667 Health Services and Insurance Plan ("Shareholder"), a shareholder of Sinclair Broadcasting Group, Inc. ("Sinclair" or the "Company"). Attached to this letter as Exhibit "A" is a true and correct copy of Shareholder's account statements reflecting the Shareholder's continuous beneficial ownership of Sinclair prior to February 2017.

Upon information and belief, as described below, the Company's directors and senior officers (at times referred to herein as the "Officers/Directors") breached their fiduciary duty by failing to use reasonable best efforts to take all actions to avoid or eliminate any impediment to obtain regulatory approval for their proposed merger with Tribune Media Co. ("Tribune").

Sinclair, a Maryland corporation headquartered in Hunt Valley, Maryland, is one of the largest and most diversified television broadcasting companies in the country. The Company's business is governed by the rules and regulations of the Federal Communications Commission ("FCC") and its common stock trades on the NASDAQ under the ticker symbol "SBGI." The Company is controlled by four brothers; David D. Smith, Executive Chairman and Chairman of the Board; Frederick Smith, Vice President and director; J. Duncan Smith, Vice President, Secretary and director; and Robert Smith, director (collectively, the "Smith Brothers"). Together, the Smith Brothers own a 75% interest in Sinclair, including all of the Company's Class B common stock.

On May 8, 2017, Sinclair announced a proposed $3.9 billion merger with Tribune Media Co. ("Tribune"), which the Company called the "largest acquisition" in the Company's history. The Press Release announcing the merger stated that "in order to comply with FCC ownership requirements and antitrust regulations, Sinclair may sell certain stations in markets where it currently owns stations. Such divestitures will be determined through the regulatory process."

On June 26, 2017, Sinclair and Tribune filed their Application for Approval of Proposed Merger and "Comprehensive Exhibit" with the FCC which, among other things, explained that Sinclair and Tribune would sell certain stations to comply with FCC regulations. On July 3, 2017, Sinclair filed on Form S-4 a Registration Statement with the SEC in connection with the merger. Sinclair subsequently filed on Form S-4/A an Amendment to the Registration Statement on August

Sinclair Broadcasting Group, Inc.
Board of Directors
August 24, 2018
Page -2-

15, 2017.  These statements, signed by the Company's Chief Executive Officer, Chief Financial Officer and all four Smith Brothers, assured investors and the FCC that it was using its "best efforts" to obtain regulatory approval and close the deal and that the Company would sell or divest certain stations as necessary "in order to comply with FCC ownership requirements and antitrust regulations."

On January 11, 2018, the FCC issued a letter requesting Sinclair and Tribune submit additional information related to what divestitures the companies would make to comply with FCC ownership regulations.  On February 21, 2018, Sinclair subsequently filed an application with the FCC detailing the purported divestiture of twenty-three television stations seemingly to comply with FCC ownership rules.  Many of the proposed "divestitures," however, were not divestitures at all but were instead insider deals with buyers connected to Sinclair and the Smith Brothers personally. Moreover, these "divestitures" contained terms that allowed Sinclair to continue to exert its control over the stations in contravention of FCC ownership rules.

On July 16, 2018, news reports disclosed that FCC Chairman Ajit Pai was internally circulating a draft order designating the Sinclair/Tribune merger proposal for a hearing in front of the FCC's administrative law judge, explaining that "the evidence we've received suggests that certain station divestitures that have been proposed to the FCC would allow Sinclair to control those stations in practice, even if not in name, in violation of the law."

Three days later, on July 19, 2018, the FCC made public its final Hearing Designation Order ("HDO"), which stated that "there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts" and questioned whether Sinclair had "attempted to skirt the Commission's broadcast ownership rules."  As a result of the forgoing, on August 9, 2018, Tribune announced its withdrawal from the $3.9 billion merger and said that it had filed a lawsuit in the Delaware Chancery Court against Sinclair seeking $1 billion in damages for losses incurred as a result of Sinclair's "spectacular" "material breaches" of their merger agreement.

We hereby demand pursuant to Maryland law[1] that the Board of Directors of Sinclair (the "Board") take action to remedy breaches of its fiduciary duties and gross mismanagement by current and former officers and directors.

The Board breached its fiduciary duties by:

(i)       failing to use reasonable best efforts to take all actions to avoid or eliminate any impediment to obtain regulatory approval;

---

[1] "Before bringing a derivative suit in Maryland . . . the shareholder must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile." *Bender v. Schwartz*, 172 Md. App. 648, 666, 917 A2d 142, 152 (2007).

HRSC LLP

Sinclair Broadcasting Group, Inc.
Board of Directors
August 24, 2018
Page -3-

(ii)    engaging in non-arm's length transactions with buyers connected to Sinclair's controlling shareholders in order to skirt FCC ownership rules[2]; and

(iii)   exposing Sinclair to potential liability and substantial costs from investigations and litigation regarding the conduct set forth herein.

Specific instances from which a significant inference of gross mismanagement can be drawn are, including without limitation, the following:

1.   The FCC's draft order designating the Sinclair/Tribune merger proposal for a hearing in front of the FCC's administrative law judge because of "serious concerns" that "Sinclair's actions here potentially involve deception."

2.   The FCC's final HDO, which determined that "there is a substantial and material question of fact as to whether Sinclair affirmatively misrepresented or omitted material facts" and questioned whether Sinclair had "attempted to skirt the Commission's broadcast ownership rules."

3    Tribune's withdrawal from the $3.9 billion merger and subsequent lawsuit filed in the Delaware Chancery Court against Sinclair seeking $1 billion in damages for losses incurred as a result of Sinclair's "spectacular" "material breaches" of their merger agreement.

This demand to take action is made under oath and the statements made herein are affirmed to be true under penalty of perjury under the laws of the United States or all states.

We await your response.

Very truly yours,

Daniel B. Rehns

cc:   Frank R. Schirripa
      David R. Cheverie

---

[2] Sinclair proposed the sale of two Texas television stations, KIAH in Houston and KDAF in Dallas, for approximately $60 million, more than $40 million below market price. The Company also sought approval for the sale of WGN-TV in Chicago for just $60 million, again significantly below market price.

# EXHIBIT C

# Thomas & Libowitz, P.A.

A Professional Association founded in 1975

STEVEN ANARGYROS THOMAS·•
ROBERT A. SNYDER, JR.
JOHN R. WISE
C. WAYNE DAVIS
FRANCIS R. LAWS
CHARLES B. JONES
SCOTT H. MARDER^

MEMBERS
MARGARET L. ARGENT+
ANDREW K. O'CONNELL
ANASTASIA THOMAS NARDANGELI

ASSOCIATES
MUNACHI O. NSOFOR≈
SIMA G. FRIED=
CLINTON R. BLACK, V~
PAUL A. SNYDER+
HENRY A. ANDREWS
JASON A. DENKEVITZ
STEPHEN E. DEMOS

COUNSEL
CLINTON R. BLACK, IV
DAVID M. SHEEHAN~○
DERRICK WANG

100 Light Street, Suite 1100 • Baltimore, MD 21202
Phone: 410-752-2468 • Fax: 410-752-2046

www.tandllaw.com

*Serving the Community for over 40 Years*

Also Member of DC Bar +
Also Member of VA Bar ·
Also Member of NY Bar =
Also Member of CT Bar ~
Also Member of MA Bar ○
Also Member of FL Bar ^

August 28, 2018

<u>Via Certified Mail & First Class Mail</u>

Daniel B. Rehns
Hach Rose Schirripa & Cheverie LLP
112 Madison Avenue, 10th Floor
New York, NY 10016

*Re: Sinclair Broadcast Group, Inc.*

Dear Mr. Rehns:

Please be advised that we are outside counsel to Sinclair Broadcast Group, Inc. ("Sinclair") and have received a copy of your letter dated August 24, 2018 (the "Letter"), which was delivered to Sinclair's corporate headquarters via Federal Express on August 27, 2018. The Letter was addressed to the Sinclair Board of Directors (the "Board") and has been forwarded to all members of the Board.

Once the Board has reviewed and considered the matters raised in your letter, a representative of Sinclair will contact you.

Very truly yours,

Steven Anargyros Thomas

cc:     Board of Directors, Sinclair Broadcast Group, Inc.
        Christopher S. Ripley
        Barry M. Faber

# SMITH, GILDEA & SCHMIDT, LLC

MICHAEL PAUL SMITH
DAVID K. GILDEA
LAWRENCE E. SCHMIDT
MICHAEL G. DEHAVEN
JASON T. VETTORI

LAUREN D. BENJAMIN
MARIELA C. D'ALESSIO*
MELISSA L. ENGLISH
CARMELO D. MORABITO
SARAH A. ZADROZNY

*of counsel:*
EUGENE A. ARBAUGH, JR.
DAVID T. LAMPTON
MARY G. LOKER
STEPHEN J. NOLAN

* LICENSED IN MD, PA, FL

December 6, 2018

***VIA HAND DELIVERY***
Circuit Court for Baltimore County
**Attn: Clerk's Office**
401 Bosley Avenue
Towson, Maryland 21204

Re: **Teamsters Local 677 Health Services & Insurance Plan v. Howard E. Friedman, et al.**

To Whom It May Concern:

Enclosed please find a check#3270, in the amount of $185.00, to cover fees associated with this initial filing and the appearance fee for Michael Paul Smith and Melissa L. English of Smith, Gildea & Schmidt, LLC.

Also enclosed please find the Civil Non-Domestic Case Information Report, Shareholder Derivative Complaint and Motions for Special Admission Out-Of-State Attorney for Daniel D. Rehns and Frank R. Schirripa of Hach Rose Schirripa and Cheverie, LLP. Copies of the same are also enclosed to be dated stamped and returned to the courier.

If you have any questions or concerns, please do not hesitate to contact our office.

Very truly yours,

Tajuana N. Paige
Paralegal

/tnp
Enclosures